UNITED STATES of America,
Plaintiff-Appellee,

v.

Thomas ALFREY, Davis Michael Haight and Grover P. Kennedy,
Defendants-Appellants.

No. 79–5014.

United States Court of Appeals,
Fifth Circuit.

Feb. 20, 1980.

---

Edward S. Campbell, III, (Court-appointed), Tampa, Fla., for Alfrey.

Angelo M. Ferlita, (Court-appointed), Tampa, Fla., for Haight.

Philip J. Padovano, Tallahassee, Fla., for Kennedy.

Gary J. Takacs, Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellee.

Before SIMPSON, CHARLES CLARK and FRANK M. JOHNSON, JR., Circuit Judges.

SIMPSON, Circuit Judge:

A jury convicted appellants Alfrey, Haight and Kennedy of importing marijuana, possessing marijuana with intent to distribute it, and conspiring to commit these offenses in violation of 21 U.S.C. §§ 841, 846, 952, and 963, and 18 U.S.C. § 2. They were each sentenced to three concurrent four year sentences.

We consider on this appeal three challenges to the convictions. First, all appellants argue that the district judge erred by refusing to suppress the evidence gained from the search of the vessel RUNNING BEAR. Second, Haight and Alfrey argue that the trial judge improperly admitted certain hearsay evidence under Rule 803(24) of the Federal Rules of Evidence. Third, all argue the evidence is insufficient to support the jury verdict. We find the search

was valid; therefore its evidential fruits were properly admitted. Because we apply the concurrent sentence doctrine, it is unnecessary to consider whether the hearsay evidence was improperly admitted. Although the evidence is insufficient to support two of appellant Kennedy's convictions, importation of marijuana and conspiracy to possess and import marijuana, it is sufficient to support Kennedy's conviction for possession with intent to distribute and all convictions of appellants Haight and Alfrey.

## FACTS

On May 22, 1978 at 3:00 P.M. United States Customs Patrol Officers Gehr, Tenbieg and Scott anchored the PELICAN, an unmarked thirty-six foot sport fishing type Customs vessel, off the southern tip of Egmont Key, an island lying in a north-south attitude off the mouth of Tampa Bay. The Customs officers were dressed as ordinary fishermen. Their anchorage afforded a clear view of the Southwest Passage, an entrance to Tampa Bay south of Egmont Key and the main shipping channel, an entrance to the Bay to the north. Although the PELICAN outwardly appeared an ordinary fishing vessel, it was equipped with radar, night vision goggles and binoculars. Its mission was to survey traffic entering or leaving Tampa Bay.

The weather was mild, the seas light and the moon full that night. From 3:00 P.M. until 9:00 P.M. only a phosphate shipping vessel was seen in the main channel; no vessels were observed in the Southwest Passage. At 9:00 P.M. a thirty-five to forty foot speedboat departed the Southwest Passage. At 11:30 P.M. a twenty-five to thirty foot speedboat sped out the Southwest Passage. At approximately 1:00 A.M. a seventy foot North American trawler type vessel was sighted two to three miles offshore steaming toward the Southwest Passage. It was the first time that a trawler of this type had been seen in the area by any of the Customs officers. Unknown to them at that time, the trawler, later identified as the RUNNING BEAR, was laden with 19,-

094 pounds of marijuana. The vessel entered the Southwest Passage and proceeded up the main shipping channel toward the Sunshine Skyway bridge.

Ten minutes later a Wellcraft Nova entered the Southwest Passage. It was of the same size and configuration as the vessel observed speeding out the Southwest Passage at 11:30 P.M., but the officers were unable to positively identify it as the same vessel. The Nova did not have all its navigation lights on and appeared to be having engine trouble. It eventually overtook the trawler, approaching within ten to twenty feet. Shortly thereafter the PELICAN weighed anchor and began a moving surveillance as the trawler traveled up the main shipping channel. About 2:00 A.M. the trawler passed under the Sunshine Skyway bridge, which traverses Tampa Bay from north to south approximately ten miles inland.

Continuous visual contact was maintained with the trawler, but the Customs officers had previously lost sight of the Nova. However, minutes after passing under the bridge, a Wellcraft Nova of similar size and configuration as the Nova observed earlier approached the PELICAN'S stern and maneuvered alongside. Only a single operator was visible on board, but there was a small cuddy cabin aft large enough to conceal another person. The Nova was operating without lights and an object was tied around the windshield. [The Nova was captured later the next morning. The object tied around the windshield was a shirt covering the running light. The fuses to all the other lights had been removed.] The operator of the Nova asked why the PELICAN was running without lights; the Customs officers placed the same query to the Nova. Communication was difficult because of the engine noise. Suddenly the Nova cut sharply across the port bow of the PELICAN and proceeded directly to the trawler. One of the officers, aided by the night vision goggles, observed the Nova pull up close to the trawler. The Nova then proceeded up the channel for a short distance, made a large circle and fell in behind the PELICAN for ten to fifteen minutes.

Meanwhile the trawler continued northerly up the channel to marker 7F, then headed west for approximately 1000 yards before abruptly facing about and coming back toward the PELICAN. As the trawler passed officer Gehr brought the PELICAN about and came along the port side of the trawler. The officers observed that the vessel was heavily laden because her plimsoll line was not visible. After some small talk passed between the vessels, the Customs officers decided to board for a documents check. Officer Gehr piloted the PELICAN into position, identified himself and the others as Customs officers and informed the crew of the trawler of their intention to board. Chester Leon Curtis, later identified by the vessel's sailing permit as its captain, replied: "If you're going to come aboard, come aboard." Record vol. IV at A–173. From his position on the flying bridge of the PELICAN officer Gehr observed someone attempting to hide on the starboard side of the trawler. Suddenly, a Magnum type speedboat, resembling the larger speedboat observed departing the Southwest Passage at 9:00 P.M., cut closely and sharply across the bows of the PELICAN and the trawler and sped away. It had three persons aboard. Almost simultaneously the Nova circled around the PELICAN and the trawler and hovered ten to fifteen feet off the starboard side of the trawler. Customs officers Scott and Tenbieg boarded the trawler after putting on their gun belts. As he walked to the stern officer Tenbieg observed the Nova speeding away. He asked the captain, Curtis, how many persons were on board and whether there were any weapons. The captain replied that three persons were on board and that they had no weapons. Officer Tenbieg instructed the captain to assemble everyone on the port side of the trawler. Only appellants Alfrey and Haight joined the captain there. The two officers than made a cursory inspection to determine whether there were any other persons on board; they found appellant Kennedy hiding on the starboard side of the trawler. Kennedy was bare chested and dressed in street shoes and trousers.

Both officers noticed the smell of marijuana as they escorted Kennedy through the open wheelhouse; officer Scott decided to conduct a further investigation. Several burnt marijuana cigarettes were lying in plain view in the open wheelhouse and a small quantity of marijuana was lying on a table in the salon. Upon opening a small hatch he discovered that the trawler was loaded with bales of marijuana. All four persons aboard, Curtis,[1] Alfrey, Haight and Kennedy were then arrested.

The ship's sailing permit was later discovered on board. It indicated that the RUNNING BEAR, commanded by Captain Curtis, had permission to sail from the port of Cartagena, Colombia on May 12, 1978 with a crew of three men and no passengers. The permit was signed by the port captain.

## THE SEARCH AND SEIZURE

█ Because the search was valid on two independent grounds the district court denied appellant's motions to suppress the evidential fruits of the search. First, as counsel for appellant Kennedy concedes, the recent decision of this court in *United States v. Whitaker*, 592 F.2d 826 (5th Cir. 1979), *rehearing en banc denied*, 601 F.2d 586, *cert. denied*, ── U.S. ──, 100 S.Ct. 422, 62 L.Ed.2d 320, clearly holds that United States Customs officers have authority under 19 U.S.C. § 1581(a)[2] to stop and board vessels initially sighted in customs waters for document checks even in the absence of a modicum of suspicion or probable cause. *See also United States v. Kleinschmidt*, 596 F.2d 133, 135 (5th Cir. 1979), *cert. denied*, ── U.S. ──, 100 S.Ct. 267, 62 L.Ed.2d 184; *United States v. Free-*

*man*, 579 F.2d 942, 945 (5th Cir. 1978). This interpretation of § 1581(a) does not offend the Fourth Amendment. *Whitaker, supra*, 592 F.2d at 829. The trawler was initially sighted within customs waters;[3] therefore the Customs officers acted within their authority in stopping and boarding it. Once the officers were on board, the limited topside inspection, to ascertain whether all persons on board were accounted for, was a justified safety precaution. For these reasons the officers were properly in a position from which they had a "plain view" of the marijuana in the open wheelhouse and salon and of the strong smell of marijuana in the wheelhouse. *See Whitaker, supra*, 592 F.2d at 828–29. The obvious presence of marijuana gave rise to probable cause which, combined with the exigent circumstances peculiar to a moving vessel justified the subsequent warrantless search. *Id.; United States v. Kleinschmidt, supra*, 596 F.2d at 136. The facts in *Whitaker* are indistinguishable from the facts of the instant case on any material ground; this panel is of course bound by prior panel decisions of the court. *Trunkline Gas Co. v. FERC*, 608 F.2d 582 (5th Cir. 1979); *Puckett v. Commissioner*, 522 F.2d 1385 (5th Cir. 1975).

█ Second, the district court held that even if the Customs officers did not board to inspect the trawler's documents, the boarding was nevertheless permissible because the facts justified a reasonable suspicion that a violation of Customs laws was occurring. This court has recently held:

> Customs officers may make an investigatory stop of a vessel on inland waters adjacent to the open Gulf of Mexico under 19 U.S.C.A. § 1581(a) on facts which

---

**1.** Although tried and convicted with the other three, Curtis was not sentenced until some time later, for reasons not appearing of record here. His appeal to this court, No. 79–5529, is presently pending.

**2.** Title 19 section 1581(a) provides:

Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters or, as he may be authorized, within a customs-enforcement area established under sections 1701 and 1703–1711 of this title, or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

**3.** Customs waters are the waters from the coast to a point twelve miles offshore. 19 U.S.C. § 1401(j).

justify a reasonable suspicion of illegal activity. The evidence need not support suspicion of a border crossing, but only of the presence of contraband. *See United States v. Rivera*, 595 F.2d 1095, 1098, n. 4 (5th Cir. 1979).

*United States v. Serrano*, 607 F.2d 1145, at 1148 (5th Cir. 1979). The following events justified a reasonable suspicion in the present fact situation: (1) the numerous suspicious encounters between the trawler and the speedboats, (2) the improper lighting on the Nova, (3) the unusual design of the trawler for the Tampa Bay waters, (4) the late hour at which the events occurred and, (5) the trawler's heavily laden condition as evidenced by the fact that it was riding low in the water. These events are comparable to the events found to justify a reasonable suspicion in *United States v. Serrano. See also, United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (discussing the factors to be considered in assessing reasonable suspicion).

## SUFFICIENCY OF THE EVIDENCE

At the conclusion of the government's case appellants moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The district court denied the motion. Appellants Alfrey and Kennedy challenge the denial claiming the evidence was insufficient to support the jury verdict.

■ In considering appellants' sufficiency of the evidence arguments we must view the evidence in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Bright*, 550 F.2d 240, 242 (5th Cir. 1977). The test for sufficiency of the evidence is "whether, taking the view most favorable to the government, reasonable minds could conclude that the evidence is inconsistent with any [reasonable] hypothesis of the accused's innocence." *United States v. Suarez*, 608 F.2d 584, at 586 (5th Cir. 1979). *See also United States v. Moore*, 505 F.2d 620, 623 (5th Cir. 1974), *cert. denied*, 421 U.S. 918, 95 S.Ct. 1581, 43 L.Ed.2d 785 (1975); *United States v. Ed-*

*wards*, 488 F.2d 1154, 1157 (5th Cir. 1974). The jury could have reasonably concluded that appellants Alfrey and Haight sailed as crew members from Colombia, South America to their point of capture within Tampa Bay in a vessel laden with over 19,000 pounds of marijuana. That conclusion and the highly suspicious events of the night of the capture could logically lead the jury to conclude that Alfrey and Haight imported marijuana into the United States, possessed marijuana with intent to distribute it and conspired to commit these two substantive offenses.

Appellant Haight relies on decisions of this court holding that mere presence in an area where drugs are discovered is insufficient evidence to support a conviction for possession. *United States v. Rojas*, 537 F.2d 216 (5th Cir. 1976), *cert. denied* 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777; *United States v. Ferg*, 504 F.2d 914 (5th Cir. 1974). These cases do not aid appellants because more than mere presence has been established in the instant case. In *United States v. Ferg, supra*, we held that evidence that the accused was a passenger in an automobile which had marijuana hidden in it was insufficient to support a criminal conviction. Clearly a member of a three man crew on a long ocean voyage in a small vessel packed with tons of marijuana is different from the passenger in *Ferg* or the person whose fingerprints were found on envelopes containing drugs in *United States v. Stephenson*, 474 F.2d 1353 (5th Cir. 1973), or the person found crouched by a rock near a house containing marijuana in *United States v. Lopez-Ortiz*, 492 F.2d 109 (5th Cir. 1974). In this case the probable length of the voyage, inferable from the proximity of the border and the documentary evidence, the large quantity of marijuana on board, which made it indisputable that Alfrey and Haight had knowledge of the marijuana, and the necessarily close relationship between the captain of the trawler and his two man crew were factors from which the jury could reasonably find guilt beyond a reasonable doubt. *See United States v. Christian*, 505 F.2d 94, 96 (5th Cir. 1974), finding such an inference from a similar fact situation.

■ Appellant Kennedy also urges the insufficiency of the evidence against him. He was found on board the trawler attempting to hide from the customs officers and was dressed in street clothes. The late hour, his furtive behavior, his unexplained presence on board a vessel loaded with marijuana and the other suspicious circumstances of the evening were factors from which a jury could reasonably conclude that Kennedy was in possession of marijuana with intent to distribute it or at least that he was aiding and abetting the crew of the trawler in the commission of that crime. *See id.* However, the evidence of importation and conspiracy was not sufficient to allow a reasonable juror to conclude that the inference of guilt was inconsistent with every reasonable hypothesis of innocence. *E. g., United States v. Ferg, supra,* 504 F.2d at 917; *Montoya v. United States,* 402 F.2d 847, 850 (5th Cir. 1968). Considering Kennedy's dress and behavior and the presence and activity of the smaller boats, a reasonable and likely inference is that Kennedy boarded the trawler after it entered the United States and after the crime of importation of marijuana was committed. Kennedy likely became involved shortly before he was arrested; therefore a juror could not find, by the reasonable doubt standard, that Kennedy knew of the existence of the conspiracy and with that knowledge intentionally joined it. *E. g. United States v. Bright, supra,* 550 F.2d at 242; *United States v. Barrera,* 547 F.2d 1250, 1256 (5th Cir. 1977). His conspiracy and importation convictions must be reversed.

## THE CONCURRENT SENTENCE DOCTRINE

At trial the only substantial evidence of importation was the trawler's sailing permit discovered on board. The permit indicated that the trawler RUNNING BEAR, with a crew of three, had permission to sail from the port of Cartagena, Colombia, on May 12, 1978. It was signed by the port captain. The district court admitted the permit under Rule 803(24) of the Federal Rules of Evidence, the residual exception to the hearsay rule. Appellants Haight and Alfrey argue that the document was improperly admitted because counsel for the government failed to comply with the notice requirements of the rule.[4] It is questionable whether the notice requirements of the Rule 803(24) have been met, but we do not reach this difficult issue because of the concurrent sentence doctrine.

■ Appellants were all sentenced to four years on each of the three counts of the indictment; the sentences are to be served concurrently. Under the concurrent sentence doctrine it is not necessary to consider errors concerning a conviction for which the appellant has a sentence concurrent with the sentence of an affirmed conviction where there is no substantial possibility that the unreviewed conviction will adversely affect future parole. *United States v. Vasquez-Vasquez,* 609 F.2d 234 (5th Cir. 1980); *United States v. Rubin,* 591 F.2d 278 (5th Cir. 1979). Exclusion of the document would not require reversal of the possession with intent to distribute conviction because of the other overwhelming evidence of guilt. The Parole Commission gives the same weight to a reversed conviction as to an affirmed conviction when the reversal is not based on grounds related to guilt or innocence. *United States v. Vasquez-Vasquez, supra,* 609 F.2d at 235, n. 2; *United States v. Rubin, supra,* 591 F.2d at

---

**4.** Rule 803(24) provides that the following is not excluded by the hearsay rule:

A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

281; United States Parole Commission Research Unit, *Guideline Application Manual*, at 4.08 (Nov. 1977 No. 16) (Adopted by the Commission as Appendix 4, U. S. Parole Commission Procedure Manual, May 1, 1978). Therefore, a reversal based on improper admission of the sailing permit would not likely affect appellants' chances for future parole inasmuch as an improper denial of a motion to suppress reliable evidence is a ground unrelated to guilt or innocence. *United States v. Vasquez-Vasquez, supra,* 609 F.2d at 235 n. 2. Accordingly we need not consider the alleged error in admitting the sailing permit under Rule 803(24) of the Federal Rules of Evidence.[5]

In summary, we reverse appellant Kennedy's importation and conspiracy convictions because we find the evidence insufficient to support a criminal conviction on those charges. In all other respects the district court judgment is correct and is affirmed.

REVERSED IN PART and AFFIRMED IN PART.

---

5. The concurrent sentence doctrine cannot properly be applied to appellants' allegations of insufficiency of the evidence as insufficiency of the evidence is a ground related to guilt or innocence. See *United States v. Vasquez-Vasquez, supra,* 609 F.2d at 235 n. 2.