UNITED STATES of America,
Plaintiff-Appellee,

v.

Stanley MacPHERSON and Kenneth
Underhill, Defendants-Appellants.

No. 80–5760.

United States Court of Appeals,
Fifth Circuit.*
Unit B

Dec. 14, 1981.

* Former Fifth Circuit case, Section 9(1) of Public
Law 96–452—October 14, 1980.

Philip Carlton, Jr., Thomas A. Wills, Miami, Fla., for defendants-appellants.

Daniel H. Forman, Linda Hertz, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.

Before GODBOLD, Chief Judge, TJOFLAT and THOMAS A. CLARK, Circuit Judges.

TJOFLAT, Circuit Judge:

Stanley MacPherson and Kenneth Underhill were convicted following a bench trial in the district court on a two-count indictment charging them with importing marijuana into the United States in violation of 21 U.S.C. §§ 952 and 960 (1976), and possessing marijuana with intent to distribute it in violation of 21 U.S.C. § 841 (1976). They appeal, claiming that the 609 pounds of marijuana that led to their convictions were seized during an unlawful search and that the prosecution failed to prove either offense alleged in the indictment.

We hold that the marijuana was discovered and seized by U. S. Customs agents in a permissible border search; therefore, the district court was correct in overruling appellants' motion to suppress it. We also hold that the evidence was sufficient to make out a case against MacPherson on the possession count and that the concurrent sentence doctrine is applicable; therefore, we affirm his conviction on both counts. As for Underhill, however, we find that the government failed to establish a case against him on either count and accordingly we set aside his conviction.

## I.

The case was tried to the district court on evidence previously adduced at a preliminary hearing held by the magistrate and a suppression hearing conducted by the district court. This evidence established the following facts. On November 18, 1979, at approximately 7:00 a. m., a Dade County, Florida, Public Safety Department airplane was patrolling off the west coast of Bimini, a reputed haven for drug smugglers located forty-three miles east of the Florida peninsula. The pilot spotted a yellow-hulled boat, approximately twenty-five feet long, five to eight miles west of Bimini; the boat was headed straight toward the Florida coast at a speed of twenty-five to thirty knots.

According to the pilot, who frequently patrolled these waters, boats generally did not travel from Bimini to the United States at such an early morning hour. Given the time of day and Bimini's reputation for smuggling activities, the pilot decided to place the boat under surveillance. Because of the differences in the relative speeds of the boat and the plane, however, the pilot could not fly over the boat unobtrusively; he was forced to circle continuously above the vessel as it sailed toward the United States.

When the boat entered United States customs waters, twelve miles from the Florida coast, the pilot notified both the Dade County Marine Patrol and U. S. Customs. He then continued to circle above the boat as it traversed the customs waters and approached the territorial waters of the United States, three miles off the coast. *Cunard S. S. Co. v. Mellon*, 262 U.S. 100, 43 S.Ct. 504, 67 L.Ed. 894 (1923). Suddenly it turned thirty degrees to the south and joined a group of trolling fishing vessels; the pilot estimated that these fishing vessels were situated approximately three to three and one-half miles off the Florida coast.

The Dade County Marine Patrol and U. S. Customs soon joined the surveillance. A Marine Patrol boat went directly to the yellow-hulled craft, communicated with it and immediately departed. The Customs agents observed that the boat had a Florida registration and had two fishing lines out. They pulled their boat alongside the craft, and Customs Officer Herm boarded it; he estimated that the boarding took place three to three and one-half miles off the Florida coast. Herm identified himself to the two persons aboard the vessel, MacPherson and Underhill, and asked them where they were coming from. MacPherson replied that they had been near Bimini and had been fishing. Herm checked the boat's registration, found it in order, and announced that he was going to search the vessel.

Officer Herm found no evidence of contraband on the deck or in the forward cabin. On further inspection he noted that one of the vessel's three hatches was sealed with a silicon gel and asked why it was sealed. MacPherson volunteered that he did not know what was in the hold, so Herm cut the seal and raised the hatch. He immediately smelled marijuana and observed several bales stacked in the hold.

Officer Herm placed MacPherson and Underhill under arrest and informed them of their *Miranda* rights; they chose to remain silent. Herm then put them in handcuffs and directed them to sit in the stern while he took the vessel into port. During this trip MacPherson broke silence and asked Herm to increase the boat's speed so that it would "plane" and thus minimize engine wear; the agent complied. Later, while being processed at the Customs House, MacPherson abruptly made an unsolicited statement to Officer Herm. He told Herm: "This is the first and last time I will ever do anything like this."

## II.

■ As the district court found, Customs did not stop and board appellants' boat under the authority of 19 U.S.C. § 1581 (1976), for the purpose of inspecting the vessel's documents or for making a safety check; instead, it conducted a border search. 19

U.S.C. § 482 (1976).[1] The court upheld this search because the Customs agents had a reasonable belief that appellants were seeking to enter the United States and because the search was conducted at the border or its functional equivalent.

MacPherson and Underhill challenge the district court's conclusion on three grounds. First, they claim that Customs cannot make a border search of a vessel unless it has proof that the vessel has had contact with a foreign port or a foreign ship. In this case, appellants point out, Customs had no such proof; therefore, a border search was not in order. We recently rejected this contention in *United States v. Stone*, 659 F.2d 569 (5th Cir. 1981). There we said that Customs may "inspect each individual or item as it enters our borders . . . with complete impunity;" there is no need to show that it "actually left foreign soil." *Id.*, at 573. This language plainly eliminates the foreign nexus requirement appellants would impose.

■ Appellants next claim that the court's finding that the Customs agents were reasonably certain that the yellow-hulled boat was seeking entry into the United States is clearly erroneous. The evidence before the district court negates this claim. At the time Officer Herm boarded appellants' vessel, he knew that the vessel, bearing a Florida registration, had been sighted off Bimini and had traveled over thirty miles at high speed in a beeline toward the Florida peninsula. For almost an hour a Dade County Patrol plane had circled over the boat. Suddenly, as the boat reached the three-mile limit, it changed course, joined some fishing vessels, slowed to trolling speed and threw two fishing lines into the water. Appellants argue that the only inference the Customs agents, and

the court, could have drawn from this behavior was that appellants knew they were being followed, would be subject to a border search if they maintained their course, and therefore decided not to enter the United States.

■ The fact that appellants took steps to hide from the patrol plane and to avoid a border search did not contradict the inference that appellants were heading for Florida; if anything, it reinforced that inference. The district court's finding that the agents had reason to believe that appellants' boat was seeking to enter United States territory, therefore, was well founded.

■ Appellants' final challenge to the district court's determination that a valid border search occurred is that a border search cannot be conducted outside the three-mile limit. Here, the search took place three to three and one-half miles from the Florida coast; the court concluded that this was at the border or at its functional equivalent. We need not decide whether a search beyond the three-mile limit constitutes a search at the functional equivalent of the border,[2] for we are convinced that the court's alternative holding, that the search occurred at the border, is sound.

The sea border is an imaginary line in the ocean that bends and twists to follow an ever changing coast. *United States v. Freeman*, 579 F.2d 942, 946 (5th Cir. 1978). Each movement of a vessel changes its position relative to that coastline; and a boat running laterally along the coast might be a half mile outside the border at one point and well within the border at another. Thus, fishing boats trolling near the border, like those the appellants joined, may enter

1. The government did not contend that the Customs agents had probable cause, or even reasonable suspicion, to search the vessel. Nor did it contend that MacPherson or Underhill consented to the search.

2. Commentators have suggested that the contiguous zone, the area between the three-mile sea boundary and the twelve-mile customs waters limit, should be considered the functional equivalent of the border for the purpose of conducting border searches of vessels seeking entry into the United States. *See* Note, *High on the Seas: Drug Smuggling, the Fourth Amendment and Warrantless Searches at Sea*, 93 *Harv.L.Rev.* 725, 731–738 (1980); *see also, United States v. Williams*, 617 F.2d 1063, 1095–96 (5th Cir. 1980) (en banc) (Rubin, J., concurring).

and leave the territorial waters several times a day. At a given moment it is not likely that they would know whether they were within or without the territory of the United States. The sea border has no fixed entry points like its land counterpart, *id.*; no natural or manmade objects mark its path. A vessel's position relative to the border can only be estimated; it cannot be determined precisely.

Given the contours of the coastline of southeast Florida, we think that a vessel estimated to be within one-half mile of the sea boundary is, for all intents and purposes, at the border of the United States. Therefore, the court did not err when it inferred from the agents' estimates that appellants' boat was searched at the territorial border.

█ A border search is reasonable in a fourth amendment context simply by virtue of the fact that it occurs at the border. *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617 (1977); *United States v. Sandler*, 644 F.2d 1163, 1165 (5th Cir. 1981) (en banc). We therefore affirm the court's denial of the appellants' motion to suppress the 609 pounds of marijuana that the customs agents discovered in that search.

### III.

█ MacPherson contends that although he was given adequate *Miranda* warnings, the statements he made subsequent to his arrest are inadmissible as fruits of the illegal search. We need not consider this issue because we have found the search of the vessel to have been lawful. MacPherson also questions the admissibility of the pre-arrest statement he made to Officer Herm about fishing near Bimini. This statement corroborated the agent's belief that appellants had come from Bimini and were seeking to re-enter the United States; therefore, MacPherson submits, the statement was inculpatory. It is lawful for a Customs agent to question a person at the border, *United States v. Martinez-Fuerte*, 428 U.S. 543, 566–67, 96 S.Ct. 3074, 3087, 49 L.Ed.2d 1116 (1976); this being a border

inspection, the questions put to MacPherson were appropriate. *Miranda* warnings were not required. *Id.; See United States v. Gray*, 659 F.2d 1296 (5th Cir. 1981) (Coast Guard's routine stop of American vessel does not create a custodial situation necessitating *Miranda* warnings). MacPherson's pre-arrest statement was clearly admissible.

### IV.

MacPherson and Underhill claim that the evidence was insufficient to support their convictions; taking the view most favorable to the government, they argue, reasonable minds could *not* conclude that the evidence was inconsistent with every reasonable hypothesis of innocence. *United States v. Bell*, 649 F.2d 281, 284, *rehearing en banc granted*, slip op. 11581 (5th Cir. 1981); *United States v. Alfrey*, 620 F.2d 551, 555 (5th Cir. 1980).

█ There is ample evidence to support MacPherson's conviction for possession of marijuana with intent to distribute. MacPherson was present on a boat that contained 609 pounds of marijuana in a sealed hatch. The boat was making a hard run for Florida; its mission was to deliver a cargo of marijuana. MacPherson exhibited control over the boat; he was the one who answered the questions Officer Herm directed to him and Underhill, and he assisted the agent in opening the sealed hatch. MacPherson showed particular concern over the manner in which Herm piloted the boat to shore; he told Herm not to go too slowly, that the engine would wear better if the boat planed. Finally, MacPherson told Officer Herm, after full *Miranda* warnings, that "this is the first and last time I will do anything like this."

█ MacPherson concedes, quite correctly, that it is a crime under 21 U.S.C. § 841(a)(1), to possess a controlled substance with intent to distribute it in the United States even if the substance is discovered outside the country's three-mile territorial jurisdiction but within the customs waters. *United States v. Baker*, 609 F.2d 134, 135–36 (5th Cir. 1980). Therefore, the govern-

ment was not required to prove beyond a reasonable doubt that MacPherson possessed the marijuana in the United States.

We need not address MacPherson's claim that the government failed to prove the importation count because it did not establish that MacPherson brought the marijuana into the territory of the United States. MacPherson's sentence on this count runs concurrently with that imposed for the possession count and carries no collateral consequences.[3] Therefore, this is a proper case for the application of the concurrent sentence doctrine. *United States v. Robbins*, 623 F.2d 418, 420–21 (5th Cir. 1980); *United States v. Rubin*, 591 F.2d 278, 280 (5th Cir.), cert. denied, 444 U.S. 864, 100 S.Ct. 133, 62 L.Ed.2d 87 (1979).

The evidence against Underhill was that he was present on the boat with MacPherson. Mere presence in an area where drugs are discovered is insufficient to support a conviction, *United States v. Rojas*, 537 F.2d 216 (5th Cir. 1976), cert. denied 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977); *United States v. Ferg*, 504 F.2d 914 (5th Cir. 1974), yet the government proved nothing more.

The stipulated record in this case informed the district court of very little about the yellow-hulled boat; no diagram of the boat was presented, nor was a detailed description given by any of the witnesses. All that the court knew was that the vessel was a twenty-six foot Thunderbird Formula. The court therefore could not determine whether the smell of the marijuana was detectable before the hatch was opened, or even where the hatch was located. The record does not indicate when Underhill boarded the vessel or the nature of his relationship with MacPherson. All we know is that Underhill and MacPherson were in the boat together when Officer Herm came aboard.

The government contends that more than mere presence can be inferred from the record before us. They argue that we upheld convictions in two similar cases: *United States v. Alfrey*, 620 F.2d 551 (5th Cir. 1980), and *United States v. Robbins*, 629 F.2d 1105 (5th Cir. 1980). In these cases, the government contends, we inferred guilty knowledge from the small size of the vessel, the size of the crew, the close working relationship required between the captain and crew, the length of the voyage, and the quantity and unique smell of marijuana. In our view, the small size of the boat in this case is perhaps the only factor that makes it similar to *Alfrey* and *Robbins*. Unlike *Robbins*, where the appellant owned the vessel, no connection was shown between Underhill and the boat; he might well have been only a passenger and not part of the crew. The record reveals nothing about the relationship between Underhill and MacPherson; they may have been friends or strangers. Moreover, the voyage from Bimini to Florida was short, less than two hours, in comparison to the trip from Colombia, South America, to Florida in *Alfrey*. Finally, in both *Alfrey* and *Robbins* there was a pronounced marijuana odor in areas of the boat frequented by the crews; in this case, as we have noted, there was no odor anywhere in the boat prior to the lifting of the hatch. In short, the holdings in *Alfrey* and *Robbins* do not support the government's position here. Rather those cases make it clear that the only permissible inference that can be drawn from the evidence was that Underhill was present at the scene of a crime; and that is not enough to support a conviction.

The convictions of Kenneth Underhill are REVERSED, and upon receipt of the mandate the district court shall dismiss the indictment as to him. The convictions of Stanley MacPherson are AFFIRMED.

---

**3.** MacPherson was sentenced to equal terms under both counts. His eligibility for parole is determined in part by the "severity rating" given his offense. The rating depends on the type and amount of the drug involved in each offense and not on the number of offenses of which he is convicted. 28 C.F.R. § 2.20 (1980). Conviction under the importation count therefore does not affect his eligibility for parole. *United States v. Robbins*, 623 F.2d 418, 420 n.4 (5th Cir. 1980).