UNITED STATES of America, Plaintiff-Appellant,

v.

Raul Antonio HIDALGO–GATO, Rodriguez-Torres, Defendants-Appellees.

No. 81–5993.

United States Court of Appeals, Eleventh Circuit.

April 25, 1983.

Stanley Marcus, U.S. Atty., Neil G. Taylor, Asst. U.S. Atty., Miami, Fla., for plaintiff-appellant.

Juan Ramirez, Jr., Coral Gables, Fla. (Court Appointed), for Hidalgo-Gato.

Marcelo Agudo, Miami, Fla., Gerardo A. Remy, Jr., Miami, Fla., for Rodriguez-Torres.

Before HILL and HATCHETT, Circuit Judges, and HAYNSWORTH *, Senior Circuit Judge.

HATCHETT, Circuit Judge:

The issue presented in this case is whether searches of vessels lawfully detained in customs waters, pursuant to 19 U.S.C.A. § 1581(a), are circumscribed by the probable cause requirement of the fourth amendment to the United States Constitution.[1] Because we hold that the contiguous zone is the functional equivalent of the border and such searches are evaluated by border search standards, we reverse and remand.

On May 5, 1981, at approximately 5:00 p.m., United States Customs air patrol officers observed a vessel leave Bimini, Bahamas, and sail toward Key Biscayne, Florida. The air patrol officers kept the vessel under surveillance and coordinated their activities with other Customs agents who were in airplanes and on vessels. This surveillance demonstrated that the vessel had entered the contiguous zone from beyond it, and its course provided ample reason to believe that it was bound for this country's shore or inland waters. At approximately 7:30 p.m., Customs officers intercepted the vessel about six miles off Key Biscayne, Florida. Two United States Customs inspectors boarded the vessel. While one Customs inspector reviewed documents, the other began a search of the vessel's cabins. The second Customs inspector found five aliens who had documentation indicating Colombi-

---

* Honorable Clement F. Haynsworth, Jr., U.S. Circuit Judge for the Fourth Circuit, sitting by designation.

1. Title 19 U.S.C.A. § 1581(a) provides that:

Any officer of the customs [defined to include Coast Guard officers by 14 U.S.C. § 89(b) (1976) and 19 U.S.C. §§ 1401(i), 1709(b) (1976)] may at any time go on board of any vessel ... at any place ... within the customs waters [defined in 19 U.S.C. § 1401(j) (1976) as those waters within twelve miles of the Coast of the United States] ... and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

an citizenship. All five aliens were without proper documents for entry into the United States. Earlier in discussions the two men aboard the vessel, Hidalgo-Gato and Rodriguez-Torres, had led the Customs inspectors to believe that no other persons were aboard the vessel. The government concedes that the search was for the fruits of any illegal activity and that nothing suspicious or unusual occurred before the Customs inspectors boarded and searched the vessel.

The grand jury of the Southern District of Florida indicted Hidalgo-Gato and Rodriguez-Torres, charging them with smuggling aliens (five counts) and aiding and abetting the illegal entry of undocumented aliens (five counts), in violation of 8 U.S.C.A. §§ 1324(a) and 1325.[2] Upon motion of Hidalgo-Gato and Rodriguez-Torres, and after a hearing, the trial court suppressed the aliens. It is from this granting of the motion to suppress that the government appeals.[3]

Another way of stating the issue is whether the contiguous zone should be considered the functional equivalent of the border.[4] The government contends that be-

2. Title 8 U.S.C.A. § 1324 provides that:
 (a) Any person, including the owner, operator, pilot, master, commanding officer, agent, or consignee of any means of transportation who—
 (1) brings into or lands in the United States, by any means of transportation or otherwise, or attempts, by himself or through another, to bring into or land in the United States, by any means of transportation or otherwise;
 (2) knowing that he is in the United States in violation of law, and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than three years prior thereto, transports, or move, or attempts to transport or [move] within the United States by means of transportation or otherwise, in furtherance of such violation of law;
 (3) willfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, in any place, including any building or any means of transportation; or
 (4) willfully or knowingly encourages or induces, or attempts to encourage or induce, either directly or indirectly, the entry into the United States of—
 any alien ... not duly admitted by an immigration officer or not lawfully entitled to enter or resident within the United States ... shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection occurs....
 Title 8 U.S.C.A. § 1325 provides that:
 Any alien who (1) enters the United States at any time or place other than as designated by immigration officers, or (2) eludes examination or inspection by immigration officers, or (3) obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact, shall, for the first commission of any such offenses, be guilty of a misdemeanor and upon conviction thereof

be punished by imprisonment for not more than six months, or by a fine of not more than $500, or by both, and for a subsequent commission of any such offenses shall be guilty of a felony and upon conviction thereof shall be punished by imprisonment for not more than two years, or by a fine of not more than $1,000, or both.

3. Title 18 U.S.C.A. § 3731 provides that:
 In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.
 An appeal by the United States shall lie to a court of appeals from a decision or order of a district court's suppressing or excluding evidence or requiring the return of seized property in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information, if the United States attorney certifies to the district court that the appeal is not taken for purposes of delay and that the evidence is a substantial proof of a fact material in the proceeding.
 The appeal in all such cases shall be taken within thirty days after the decision, judgment or order has been rendered and shall be diligently prosecuted.
 Pending the prosecution and determination of the appeal in the foregoing instances, the defendant shall be released in accordance with chapter 207 of this title.
 The provisions of this section shall be liberally construed to effectuate its purposes.

4. Territorial waters is defined as extending three miles from the coast. *United States v. California*, 332 U.S. 19, 33–34, 67 S.Ct. 1658, 1665–1666, 91 L.Ed. 1889 (1947); P. Jessup, The Law of Territorial Waters and Maritime Jurisdiction 49–60 (1927).

cause of the unique nature of the seas, it is impossible and impractical to establish fixed checkpoints, and therefore, for fourth amendment purposes, border search analysis should be extended to searches within the contiguous zone. Hidalgo-Gato and Rodriguez-Torres contend that the law in this area has long been settled and no need exists for further review of the issue.

 Persons and property may be searched without a warrant or probable cause upon entry into the United States. *United States v. Ramsey,* 431 U.S. 606, 621–22, 97 S.Ct. 1972, 1981–1982, 52 L.Ed.2d 617 (1977). Equally as clear, is the principle that a border search may be conducted not only at the actual border, but at its "functional equivalent." *Almeida-Sanchez v. United States,* 413 U.S. 266, 272–73, 93 S.Ct. 2535, 2539–2540, 37 L.Ed.2d 596 (1973). Border searches and searches at its functional equivalent are justified by this country's broad interest in protecting its borders. *United States v. Ramsey,* 431 U.S. 606, 621–22, 97 S.Ct. 1972, 1981–1982, 52 L.Ed.2d 617 (1972); *Carroll v. United States,* 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1924). The Supreme Court decisions supporting border and equivalent searches were premised upon searches occurring at predesignated places. It is difficult, if not impossible, to apply the predesignated place notion when considering searches at sea. The border or functional equivalent of the border necessarily must be an imaginary line at sea.

 The question of whether a search without suspicion may lawfully be conducted within the contiguous zone remains unanswered.[5] The Supreme Court of the United States has not been confronted with applying the functional equivalent border search concept to a maritime situation. This circuit, on the other hand, left this issue unanswered in *United States v. Mac-Pherson,* 664 F.2d 69 (5th Cir.1981), where the court stated: "We need not decide whether a search beyond the three-mile limit constitutes a search at the functional equivalent of the border . . . ." 664 F.2d at 72. In *MacPherson,* the court held that a search three to three and one-half miles from the shoreline was a search at the border. By so holding, the court avoided the more difficult question of whether that search could be justified as occurring at the border when it actually was conducted in the contiguous zone. The closest cases concerning our issue involves searches and seizures beyond the contiguous zone. Most of these cases have approved the warrantless search of vessels on the high seas without considering whether exigent circumstances existed. *See United States v. Erwin,* 602 F.2d 1183 (5th Cir.1979) (per curiam); *United States v. Postal,* 589 F.2d 862 (5th Cir.), *cert. denied,* 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979); *United States v. Warren,* 578 F.2d 1058 (5th Cir.1978) (en banc); *but cf. Maul v. United States,* 274 U.S. 501, 47 S.Ct. 735, 71 L.Ed. 1171 (1927) (held that the Coast Guard could seize an American vessel on the high seas beyond twelve miles if the vessel was subject to forfeiture for a violation of the United States revenue laws.); *United States v. Lee,* 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927) (expanded *Maul* so that the Coast Guard has the authority to board, search, and seize an American vessel on the high seas beyond twelve

High seas is defined as extending seaward from the territorial waters encompassing the area known as the contiguous zone. Comment, At Sea with the Fourth Amendment, 32 U. Miami L.Rev. 51, 56 (1977); *United States v. Louisiana,* 394 U.S. 11, 22–23, 89 S.Ct. 773, 780–781, 22 L.Ed.2d 44 (1969).

Contiguous zone is defined as extending nine miles from the three mile boundary, in other words, twelve miles from the coastline. See Article 24 of the Convention on the Territorial Sea and Contiguous Zone, 15 U.S.T. 1606, 1612–13 [1964].

International waters is defined as that area beyond the contiguous zone in which these waters are freely accessible to all nations and are not subject to the sovereignty of any nation. See Convention of the High Seas, art 1, 13 U.S.T. 2312, T.I.A.S. No. 5200 [1962].

5. The relevant exceptions to a warrant requirement are: (1) searches in exigent circumstances, (2) border searches, and (3) administrative searches. See, *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) (footnote omitted).

miles when probable cause exists to believe United States laws are being violated). In this case, we are faced with a search conducted in the area between the present three-mile sea boundary and the twelve-mile customs waters limit known as the contiguous zone.[6]

The dilemma we face has not gone unnoticed. The debate focuses on which interest—the public versus the individual—best benefits society. Scholars favoring the proposition that the twelve mile limit be considered a functional equivalent of the border present important points. *See* Comment, *At Sea with the Fourth Amendment*, 32 U.Miami L.Rev. 51 (1977); Comment, *Maritime Contiguous Zones*, 62 Mich.L.Rev. 848 (1964). Such important policy considerations advanced were the (1) difficulty in effectively policing the seaward national boundaries; (2) likelihood of smuggling contraband or illegal aliens by sea; (3) governmental interest in protection of the revenue, health, safety laws, and national security; (4) universal understanding that persons, parcels, and vehicles crossing the border may be searched; and (5) vessels searched are of a morally neutral class. Such reasons, as the scholars suggest, are the same reasons used to justify border searches. In addition, the United States Supreme Court acknowledged that historically the predecessor of section 1581(a), as passed by the First Congress, reveals an understanding by contemporaries of the lawmakers that such statutes may not be subject to the fourth amendment restrictions. *See Boyd v. United States*, 116 U.S. 616, 623, 6 S.Ct. 524, 528, 29 L.Ed. 746 (1886); *United States v. Stanley*, 545 F.2d 661, 666 (1976); Comment, *At Sea with Fourth Amendment*, 32 U.Miami L.Rev. 51 (1977). Another scholar urges against such head-long attempts to circumvent the fourth amendment. *See* Comment, *High on the Seas: Drug Smuggling, The Fourth Amendment, and Warrantless Searches at Sea*, 93 Harv.L.Rev. 702 (1980). This scholar notes that it is difficult to reconcile the fourth amendment requirements with the practical necessities of law enforcement on the high seas.

 The objective of the fourth amendment is to protect liberty and privacy from arbitrary and oppressive interference by government officials. *United States v. Ortiz*, 422 U.S. 891, 895, 95 S.Ct. 2585, 2588, 45 L.Ed.2d 623 (1975); *Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967). Achieving such an objective requires striking the correct balance between the government's interest and the individual's interest in dignity and privacy. As the Ninth Circuit in *United States v. Stanley*, 545 F.2d 661 (9th Cir. 1976), stated:

> A person leaving the country belongs to a class whose members sometimes violate certain laws in leaving. On crossing a border . . . [the individual] is on notice that a search may be made, and his privacy is arguably less invaded by such search.

> Because these searches are administered to [a] morally neutral class, they lack the quality of insult felt by one singled out for a search. See, Note, 77 Yale L.J. 1007 (1968).

545 F.2d at 667 (footnote omitted). This is not to say, however, that search and seizure restrictions of the fourth amendment may be unreasonable to this morally neutral class. On the contrary, such border searches, like all searches, are restricted by the requirement that they be reasonable. *Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975).

In *United States v. Williams*, 617 F.2d 1063 (5th Cir.1980) (en banc), the Fifth Circuit held that Coast Guard officers have statutory authority to seize a foreign vessel in international waters if reasonable suspicion exists that those aboard the vessel are engaged in a conspiracy to smuggle contraband into the United States. In this specially concurring opinion by Judge Rubin,

**6.** Customs waters are defined as extending four leagues, approximately twelve nautical miles, from the coastline. 19 U.S.C.A. § 1401(j).

joined by Judges Kravitch, Johnson, and Randall, border equivalent rationale was given for rejecting the notion of a probable cause fourth amendment application to the contiguous zone. In *Williams,* the specially concurring judges stated that:

Searches of persons or vehicles crossing our international boundary "are reasonable simply by virtue of the fact that they occurred at the border," *United States v. Ramsey,* 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617, 626 (1977). A border search need not be conducted at the literal boundary of the United States territory; it may be made at a place that is the functional equivalent of the border, for example, at the place where a ship docks in this country after having been to a foreign port, *United States v. Prince,* 491 F.2d 655 (5th Cir.1974), at any airport in the country, however far inland, where international flights land, *United States v. Ivey,* 546 F.2d 139 (5th Cir.), cert. denied, 431 U.S. 943, 97 S.Ct. 2662, 53 L.Ed.2d 263 (1977); *United States v. Brown,* 499 F.2d 829 (7th Cir.), cert. denied, 419 U.S. 1047, 95 S.Ct. 619, 42 L.Ed.2d 640 (1974), and at established stations near both a border and the confluence of two or more roads that extend from it, *Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). . . .

Once a vessel approaching the United States enters the three-mile limit, however invisible that line may be, it has crossed our border. It may be searched. Although the contiguous zone extends seaward rather than landward from the three-mile limit, it be considered the functional equivalent of the border. Land beyond our borders has not been regarded as the functional equivalent of the borders for this would encroach on another sovereign's domain; however, the nature of the sea and the historic policy differentiations between the contiguous waters and international waters warrants the extension of border search analysis to contiguous zone for the fourth amendment purposes.

Because there are no fixed points of entry along our coastal boundaries, searches within the twelve-mile limit are reasonable means to enforce the sovereign power to protect its borders. Moreover, limited to searches of vessels in the contiguous zone and bound for the United States, the subjective intrusion on those who enter such an area would be minimized by the historical acknowledgement that the contiguous zone is the proper place to apprehend and examine United States-bound vessels.

617 F.2d at 1095–96 (footnote omitted). In their concurring opinion, the judges advocated that the contiguous zone should be considered the functional equivalent of the border thus facilitating the extension of the border search standard to the contiguous zone.

In *MacPherson,* the court illustrates the practical difficulties of using checkpoints of short distances (three miles) to define the area where a search is authorized with less than the full fourth amendment probable cause standard. It stated:

The sea border is an imaginary line in the ocean that bends and twists to follow an ever changing coast. *United States v. Freeman,* 579 F.2d 942, 946 (5th Cir.1978). Each movement of a vessel changes its position relative to that coastline; and a boat running laterally along the coast might be a half mile outside the border at one point and well within the border at another. Thus, fishing boats trolling near the border . . . may enter and leave the territorial waters several times a day. At a given moment it is not likely [to] know whether they were within or without the territory of the United States. The sea border has no fixed entry points like its land counterpart . . . no natural or manmade objects mark its path. A vessel's position relative to the border can only be estimated; it cannot be determined precisely.

646 F.2d at 72–73.

Along with other practical difficulties posed to law enforcement agencies by having the boundary at three miles from shore

is the fact that some motor watercraft today are able to travel three miles in less than five minutes, increasing the difficulties of enforcement.[7] We do not believe it helpful to reproduce here all the reasons given by scholars to support what we do today. It is sufficient to note that we find the reasons given sufficient to convince us that the time has come to make a change.

Given the practical difficulties in maritime law enforcement and other considerations, we think it is wise to consider the contiguous zone the functional equivalent of the border. We now hold that the contiguous zone is the functional equivalent of the border. Having concluded such, the standard applied to searches in the contiguous zone will be prescribed by border search standards. *United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977); *United States v. MacPherson,* 664 F.2d 69, 72 (5th Cir.1981). Because the district court applied the wrong standard— probable cause—we reverse and remand.

REVERSED AND REMANDED.

7. These boats are popularly called "cigarette boats" which when carrying a light load can reach speeds of sixty miles per hour or more.