**Stephanie WITTEN, (Stephanie Whitten), Plaintiff,**

v.

**Winston E. PITMAN, Defendant.**

**UNITED STATES of America, Plaintiff,**

v.

**SEVENTY ONE THOUSAND THIRTY DOLLARS IN UNITED STATES CURRENCY, Defendant.**

Nos. 82–0505–Civ (JE)(JM), 82–6175–Civ (JE)(JM).

United States District Court, S.D. Florida.

May 10, 1985.

Kogen & Kogen, P.A., Miami, Fla., for Stephanie Witten; Max B. Kogen, Miami, Fla., of counsel.

---

Stanley Marcus, U.S. Atty., S.D. Fla., Robert Rosenberg, Asst. U.S. Atty., Miami, Fla., for the U.S.

*Memorandum of Decision and Order*

MISHLER, District Judge.

On October 4, 1981, U.S. Customs Agents assigned to the U.S. Customs Service at Nassau, Bahamas, seized the sum of $71,030 that was in the purse of Stephanie Witten claiming that the said sum was being brought into the United States in violation of 31 U.S.C. § 1101 (as amended 31 U.S.C. § 5316) and subject to forfeiture under 31 U.S.C. § 1102 (as amended 31 U.S.C. § 5317).[1] The money was seized from Ms. Witten's handbag while she was in the U.S. Customs Service area at the airport of Nassau, Bahamas before she boarded an Eastern Airlines flight to Ft. Lauderdale. At the time of seizure, Witten had been precleared for boarding and was in the U.S. Customs waiting lounge awaiting her flight.

On March 16, 1982, Witten filed a complaint against the District Director of the Customs Service, as an agent for the U.S. Customs Service (Case No. 82–0505 Civ–JE), charging him with: (1) conversion, (2) violating her right to due process in failing to either promptly return the money or initiate a civil forfeiture proceeding, and (3) conducting an unreasonable search in violation of her Fourth Amendment right.

The government filed a complaint for forfeiture in rem on March 25, 1982 (Case No. 82–6175–Civ–JE). Ms. Witten filed her claim as the rightful possessor of the money (Case No. 82–0505–Civ–JE).

The court consolidated the cases, for trial and they were tried to the court without a jury. The court finds:

On April 23, 1974, the United States and the Government of the Commonwealth of the Bahamas signed an agreement granting the United States the right to maintain a Customs Office in the Bahamas to examine passengers who "are subject to preclearance, for the purpose of establishing and enforcing penalties for violations of [its customs, immigration, agricultural and public health] laws and regulations upon arrival in the United States." Agreement Between the Government of the United States of America and the Government of the Commonwealth of the Bahamas on Preclearance, Art. VI, April 23, 1974.

In July, 1981, Ms. Witten was living in Ft. Lauderdale, Florida with John Edward Poulsen. In 1974, Mr. Poulsen had been convicted before a British court in London of possessing hashish and had served a year in jail. During the summer of 1981, Ms. Witten visited London, Denmark and Thailand with Poulsen. She returned to the United States from Thailand in August, 1981. On October 2, 1981, Ms. Witten left the United States to go to the Bahamas to meet Poulsen, who was flying there from England. On October 3, 1981, U.S. Customs in Nassau, Bahamas were advised that British Customs in London had informed the Drug Enforcement Administration ("DEA") that Poulsen had entered the United Kingdom carrying in excess of $70,000 in cash and that he might be traveling with a white female companion named either Stephanie Whitaker or Stephanie Sweeting. DEA was informed that Poulsen and his traveling companion were suspected of having visited a "source country" and would probably enter the United States through Customs preclearance at Nassau, Bahamas on either October 2nd or 3rd.

On October 3rd, Poulsen arrived at the hotel, at which Ms. Witten was staying in Nassau, with $71,030 in currency. Both Poulsen and Witten had airline tickets for Eastern Airlines Flight 6694 which was scheduled to leave the Bahamas for Ft. Lauderdale, Florida on October 4th. Before she left the hotel for the airport on

---

1. 31 U.S.C. § 1101 (as amended 31 U.S.C. § 5316) provides that anyone who knowingly brings more than $5,000 into the United States at one time must file a report which contains the information required in Customs Form 6059–B. 31 U.S.C. § 1102 (as amended 31 U.S.C. § 5317) authorizes seizure and forfeiture when such report "contains a material omission or misstatement."

October 4th, Ms. Witten placed four envelopes in her handbag containing $29,850, $10,320, $25,550 and $4,810, respectively. Ms. Witten was aware of the money in her handbag at the time she left the hotel. The money was the proceeds of illegal transactions conducted by Poulsen. Ms. Witten was aware of the illegal transaction or transactions that produced the large sum of cash.[2]

On the way to the airport Poulsen and Ms. Witten discussed means of avoiding detection in clearing Customs. It was agreed that they would enter different preclearance lines for examination by Customs inspectors. Ms. Witten appeared at the preclearance line of Customs Inspector David Hardman. She submitted a Customs Form 6059–B which, *inter alia*, asked whether she was carrying more than $5,000 in currency. She had marked the form "no" in response to that question (question 11). Hardman then asked her whether she was carrying more than $5,000 with her into the United States, to which she answered, "no." At the time she submitted the form and at the time she answered in the negative, she was aware that she had $71,030 in four envelopes in her handbag. She intentionally and deliberately lied to Hardman. Ms. Witten was permitted to proceed to the U.S. Customs waiting lounge for boarding of the flight.

At about the time Hardman was preclearing Ms. Witten, Poulsen approached another preclearance line. He was recognized as the individual who was suspected of carrying in excess of $70,000 in cash and who was supposedly traveling with a female companion who was carrying heroin. When this information was brought to the attention of Customs Supervisory Inspector Bennett D. Kennedy, he checked with an Eastern Airlines employee and learned that Poulsen was traveling with Ms. Witten. Inspector Kennedy noticed that Poulsen and Ms. Witten separated and used different lines at the inspectors' examining tables and purposely did not appear before the inspectors at the same time. He noticed that Ms. Witten was extremely nervous.

Inspector Kennedy directed Hardman to bring Ms. Witten to the Customs Office for an inspection of her baggage. Inspector Kennedy assigned Kathy Rodenburg, a Customs Officer, to examine Ms. Witten's baggage. A search of Ms. Witten's handbag revealed the four envelopes containing $71,030 in United States currency. An additional $510 was found in a bank book which Ms. Witten carried.

The money was Poulsen's money.[3] Poulsen used Ms. Witten as his courier, believing that the risk of detection was thereby lessened.

DISCUSSION

1. *Border Crossing*

■ Ms. Witten claims that the U.S. Customs area which was located on foreign soil was not a point of entry into the United States.[4] The customs area set aside for inspection of travelers entering the United States from the Bahamas, pursuant to the treaty, is the only place at which such persons submit to inspection before landing in the United States. In determining whether the entry into the Customs area constituted a border crossing into the United States, we turn to 18 U.S.C. § 7(3) which defines "territorial jurisdiction" (as used in Title 18) as: "Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdic-

2. The court rejects her testimony that Poulsen had amazing luck in his gambling activities, as incredible.

3. Since Judge Eaton had apparently ruled, after an evidentiary hearing, that Ms. Witten had standing to assert a claim, we do not readdress the issue but rather consider Ms. Witten's claim on the merits.

4. 31 U.S.C. § 1101 (as amended 31 U.S.C. § 5316) provides in pertinent part:

[A] person or an agent or bailee of the person shall file a report ... when the person, agent or bailee knowingly....

. . . .

(a)(2) "receives monetary instruments of more than $5,000 at one time transported into the United States from or through a place outside the United States."

tion thereof ... for the erection of a ... needful building."

We note that 18 U.S.C. § 7(3) grants "special" territorial jurisdiction in criminal matters where the situs of the crime is outside the United States. *See United States v. Erdos,* 474 F.2d 157 (4th Cir.), *cert. denied,* 414 U.S. 876, 94 S.Ct. 42, 38 L.Ed.2d 122 (1973). We believe that ratification of the treaty between this country and the Commonwealth of the Bahamas was a grant to the United States of "special" territorial jurisdiction in carrying out the purpose of 31 U.S.C. § 1101. Consequently, Ms. Witten's entry into the Customs area at the Nassau, Bahamas airport constituted a "border crossing" into the United States.

### 2. The Search and Seizure

■ It is clear that border searches may take place "not only at the border itself but at its functional equivalent as well." *Almeida-Sanchez v. United States,* 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973).

The challenge to the validity of the search is premised on Ms. Witten's claim, which we reject, that the search of her person and property was not a border search and thus required a warrant. From there Ms. Witten claims that the warrantless search violated her Fourth Amendment right against unreasonable search and seizure.

A border search "is a longstanding, historically recognized exception to the Fourth Amendment's general principle that a warrant be obtained." *United States v. Ramsey,* 431 U.S. 606, 621, 97 S.Ct. 1972, 1981, 97 S.Ct. 1972 (1977). The right to conduct a border search without a warrant is based on the "right of the sovereign to protect itself by stopping and examining persons and property crossing into this country." *Id.* 431 U.S. at 616, 97 S.Ct. at 1978; *United States v. Mosquera-Ramirez,* 729 F.2d 1352 (11th Cir.1984); *United States v. Vega-Barvo,* 729 F.2d 1341 (11th Cir.1984);

*United States v. Hidalgo-Gato,* 703 F.2d 1267 (11th Cir.1983). Under all the circumstances the search and seizure of the money was reasonable. *See United States v. Glaziou,* 402 F.2d 8, 12 (2d Cir.1968), *cert. denied,* 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969) (border searches "are restricted by requirement that they be reasonable"). Therefore, the search of Ms. Witten and seizure of the money was not a violation of her Fourth Amendment rights.

### 3. The Delay in Filing the Forfeiture Claim

■ Claimant asserts that the delay of 5½ months in filing the forfeiture claim violated her right to due process citing *United States v. $8,850 in United States Currency,* 461 U.S. 555, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983). The argument is that the delay deprived her of a meaningful hearing and thus deprived her of her right to due process. In *$8,850,* the Court noted "we have not previously determined when a post-seizure delay may become so prolonged that the dispossessed property owner has been deprived of a meaningful hearing at a meaningful time." *Id.* 461 U.S. at 562, 103 S.Ct. at 2011. The Court in *$8,850* analogized the due process claim to the right "to a speedy trial once an indictment or other formal process has been issued" and invoked the four-part balancing test as set forth in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) to determine if a due process violation had occurred. *Id.* 461 U.S. at 564, 103 S.Ct. at 2012.[5]

The claimant has the burden of establishing the violation of her right to due process under *Barker.* In weighing the four part test under *Barker,* the court finds that the claimant failed to sustain her burden. Customs formally advised the claimant of its forfeiture claim on October 14, 1981. The claimant waived her right to petition for remission or mitigation on October 25, 1981. The delay from the time of waiver

**5.** The four factors under *Barker* are: length of delay, reason for delay, the defendant's asser-

tion of her right and the prejudice she suffered as a result of the delay.

by the claimant to the time of filing the forfeiture complaint was approximately five (5) months.[6] The claimant failed to assert her right to the money until she filed a complaint in this court on March 16, 1982. The government instituted its action nine (9) days later. Moreover, the court's finding that the money belonged to Poulsen and not to Ms. Witten disposes of her claim of prejudice due to delay.

Witten's complaint in Case No. 82–0505–Civ–JE is dismissed.

Forfeiture of the sum of $71,030 is granted the government in Case No. 82–6175–Civ–JE.

A judgment in the consolidated action will be filed.

This memorandum of decision and order contains findings of fact and conclusions of law required under Rule 52(a) Fed.R.Civ.P.

---

**6.** The Court in *United States v. $8,850* referred to "the value of allowing the Government time to pursue its investigation." 461 U.S. at 564, 103 S.Ct. at 2012. In reversing the Ninth Circuit Court of Appeals which found a violation of due process in an 18-month delay, the Court remanded the case and held that the claimant "has not asserted or shown that the delay preju-

diced her ability to defend against the forfeiture." *Id.* 461 U.S. at 569, 103 S.Ct. at 2015.