UNITED STATES of America, Appellee,

v.

Milton GATLIN, Defendant–Appellant.

Docket No. 99–1447

United States Court of Appeals, Second Circuit.

Argued: Jan. 31, 2000

Decided: June 15, 2000

Colleen P. Cassidy, Federal Defender Division Appeals Bureau, Legal Aid Society, New York, NY, for Defendant–Appellant.

Paul Schoeman, Assistant United States Attorney for the Eastern District of New York (Loretta E. Lynch, United States Attorney for the Eastern District of New York, and Peter A. Norling, Assistant United States Attorney for the Eastern District of New York, of counsel), for Appellee.

Before: CABRANES and POOLER, Circuit Judges, and CARMAN, Judge.*

JOSÉ A. CABRANES, Circuit Judge:

The question presented, as a matter of first impression for this Court, is whether a civilian may be prosecuted in federal court for conduct on a United States military installation overseas. For many years, it was standard practice to try civilians who committed crimes while accompanying the military in military courts martial. *See, e.g.*, JOSEPH W. BISHOP, JR., JUSTICE UNDER FIRE: A STUDY OF MILITARY LAW 55–111 (1974). However, in a series of cases beginning with *Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), the Supreme Court ruled this practice unconstitutional with respect to offenses committed during peacetime. *See id.; Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 80 S.Ct. 297, 4

* The Honorable Gregory W. Carman, Chief Judge of the United States Court of International Trade, sitting by designation.

L.Ed.2d 268 (1960); *Grisham v. Hagan,* 361 U.S. 278, 80 S.Ct. 310, 4 L.Ed.2d 279 (1960); *McElroy v. United States ex rel. Guagliardo,* 361 U.S. 281, 80 S.Ct. 305, 4 L.Ed.2d 282 (1960); *see also United States ex rel. Toth v. Quarles,* 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955). Since *Reid* and its progeny, representatives of the armed forces, other executive branch officials, government commissions, members of Congress, and academic commentators, among others, have noted the existence of a "jurisdictional gap"—that is, the lack of any congressional authorization to try civilians who commit crimes while accompanying the military overseas in civilian courts of the United States. *See infra* notes 17–20 and accompanying text. On more than thirty occasions, Congress itself has considered, but failed to act on, bills that would close the jurisdictional gap. *See infra* note 23 and accompanying text.

In this appeal, we are confronted with a legacy of the jurisdictional gap created by the Supreme Court's decisions in *Reid* and subsequent cases. Defendant Milton Gatlin appeals from a judgment of the United States District Court for the Eastern District of New York (Carol B. Amon, *Judge*), convicting him, following a guilty plea, of sexually abusing a minor while within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. § 2243(a). On appeal, Gatlin argues, *inter alia,* that the District Court lacked jurisdiction over his case because the offense took place on property leased by the United States military in the Federal Republic of Germany. With regret, we agree. Accordingly, we reverse the judgment of conviction and dismiss the indictment. At the same time, because the existence of this jurisdictional gap is an issue that we believe warrants serious congressional consideration, we direct the Clerk of the Court to forward a copy of

this opinion to the Chairmen of the House and Senate Armed Services and Judiciary Committees.

## I.

The facts relevant to this appeal are essentially undisputed and can be stated briefly. In March 1993, Gatlin married Gail Taylor, a sergeant in the United States Army and the mother of two daughters, Claudia and Deaquanita, from a previous union. Between February 1994 and August 1997, Taylor was stationed at a U.S. Army base in Darmstadt, Germany. During that time, Gatlin and Taylor lived, together with Claudia and Deaquanita, in Lincoln Village, a housing complex on the base. Gatlin neither was a member of the United States armed forces nor was employed by the United States military in any capacity.

The United States military leases Lincoln Village from Germany, for no rent and an indefinite term, pursuant to an Accommodation Consignment Agreement (the "Agreement"). The Agreement specifies that Lincoln Village is for the "exclusive use" of the United States military, and provides that the "rights and obligations" of the parties over the premises are governed by, *inter alia,* the North Atlantic Treaty Organization Status of Forces Agreement (the "SOFA"), *see* Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces, June 19, 1951, 4 U.S.T. 1792 (entered into force Aug. 23, 1953). In turn, Article VII of the SOFA provides, *inter alia,* that the "military authorities" of a "sending State"—in this case, the United States—"shall have the right to exercise within the receiving State all criminal and disciplinary jurisdiction conferred on them by the law of the sending State over all persons subject to the military law of that State." *Id.* art. VII, § 1(a), 4 U.S.T. at 1798.[1]

**1.** Article I of the SOFA defines "military authorities of the sending State" as "those authorities of a sending State who are empowered by its law to enforce *the military law of that State* with respect to members of its

Sometime in or around August 1996, while Taylor was on duty in Bosnia, Gatlin (who was 34 years old at the time) began having sexual intercourse clandestinely with Claudia (who was 13 years old at the time) in Lincoln Village. Gatlin continued to have sexual intercourse with Claudia regularly, through at least January 1997. In September 1997, after Gatlin, Taylor, Claudia, and Deaquanita had returned to the United States, Claudia gave birth to a child. Soon thereafter, during an argument with Taylor, Claudia revealed for the first time that she and Gatlin had engaged in sexual intercourse and that Gatlin was the father of her child. A subsequent genetic test confirmed Gatlin's paternity.

Gatlin was charged in the United States District Court for the Eastern District of New York with engaging in sexual acts with a minor within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. § 2243(a).[2] After pleading guilty before a magistrate judge, but prior to acceptance of the guilty plea by Judge Amon, Gatlin moved to dismiss the indictment for lack of jurisdiction. Following oral argument on the motion, Judge Amon concluded, in a ruling from the bench, that Lincoln Village was within the "special maritime and territorial jurisdiction of the United States" as defined in 18 U.S.C. § 7(3) and that the Court therefore had jurisdiction over Gatlin's crimes.[3] Accordingly, she denied Gatlin's motion to dismiss the indictment and accepted his guilty plea.

On July 16, 1999, Judge Amon sentenced Gatlin principally to 51 months' imprisonment—to be followed by three years' supervised release—and ordered him to pay $1000 in restitution. This appeal followed.

## II.

The particular question presented in this appeal is whether 18 U.S.C. § 2243(a), which prohibits the sexual abuse of a minor while "in the special maritime and territorial jurisdiction of the United States," applies to conduct on a United States military installation outside the territorial United States. The answer to this question depends, in turn, on another, more significant question of first impression: whether 18 U.S.C. § 7(3), which is incorporated by reference into § 2243(a) (and other sections of Title 18) and which defines the "special maritime and territorial jurisdiction of the United States" to include "[a]ny lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof," applies extraterritorially. We conclude, contrary to the District Court, that § 7(3) does not apply extraterritorially and that § 2243(a) cannot, therefore, apply to Gatlin's acts. Accordingly, we reverse Gatlin's conviction and dismiss the indictment.[4]

forces or civilian components." SOFA art. I, § 1(f), 4 U.S.T. at 1794 (emphasis added).

2. Section 2243(a) states in relevant part:
Whoever, in the special maritime and territorial jurisdiction of the United States ..., knowingly engages in a sexual act with another person who—
(1) has attained the age of 12 years but has not attained the age of 16 years; and
(2) is at least four years younger than the person so engaging;
or attempts to do so, shall be [punished].

3. Section 7(3) defines "special maritime and territorial jurisdiction of the United States," as used in 18 U.S.C. § 2243(a) and other sections of Title 18, to include:

Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

4. We note that a defendant who pleads guilty, as Gatlin did, may nevertheless challenge the District Court's jurisdiction on appeal even in the absence of a court-approved reservation of issues for appeal. *See, e.g., Hayle v. United States*, 815 F.2d 879, 881 (2d Cir.1987).

## A.

At the outset, it is important to note that neither party disputes the *authority* of Congress to regulate the conduct of its citizens and nationals outside the territorial boundaries of the United States. *See, e.g., EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (*"Aramco"*) ("Congress has the authority to enforce its laws beyond the territorial boundaries of the United States."); *cf.* Harvard Research in International Law, *Jurisdiction with Respect to Crime*, 29 Am. J. Int'l L. Supp. 435, 519 (1935) ("The competence of the State to prosecute and punish its nationals on the sole basis of their nationality is universally conceded."). Thus, the issue in this case is one of congressional intent—that is, statutory construction—not of congressional power.

In determining whether a statute applies extraterritorially, we are guided by a general "presumption that Acts of Congress do not ordinarily apply outside our borders." *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 173, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993); *see Aramco*, 499 U.S. at 248, 111 S.Ct. 1227 ("It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." (internal quotation marks omitted)); *see also Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 440, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989) ("When it desires to do so, Congress knows how to place the high seas within the jurisdictional reach of a statute."). This "canon of construction," *Aramco*, 499 U.S. at 248, 111 S.Ct. 1227 (internal quotation marks omitted), is "rooted in a number of considerations," *Smith v. United States*, 507 U.S. 197, 204 n. 5, 113 S.Ct. 1178, 122 L.Ed.2d 548 (1993). It "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Aramco*, 499 U.S. at 248, 111 S.Ct. 1227. In addition, it recognizes that Congress "generally legislates with domestic concerns in mind." *Smith*, 507 U.S. at 204 n. 5, 113 S.Ct. 1178; *see also Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949).[5]

For these reasons, we "assume that Congress legislates against the backdrop of the presumption against extraterritoriality." *Aramco*, 499 U.S. at 248, 111 S.Ct. 1227. In other words, absent "clear evidence of congressional intent" to apply a statute beyond our borders, the statute will apply only to the territorial United States. *Smith*, 507 U.S. at 204, 113 S.Ct.

---

**5.** Statutes prohibiting crimes *against the United States government* may be applied extraterritorially even in the absence of "clear evidence" that Congress so intended. As the Supreme Court held in *United States v. Bowman*, 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149 (1922), the presumption against extraterritoriality "should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the Government's jurisdiction, but are enacted because of *the right of the Government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers or agents.*" 260 U.S. at 98, 43 S.Ct. 39 (emphasis added). With respect to such statutes, the Supreme Court reasoned, Congress's intent to regulate conduct abroad may "be inferred from the nature of the offense." *Id.; see also Skiriotes v. Florida*, 313 U.S. 69, 73–74, 61 S.Ct. 924, 85 L.Ed. 1193 (1941).

In the present case, the Government understandably makes no argument that the *Bowman* rule applies since Gatlin committed a crime against a private individual. Indeed, the *Bowman* Court explicitly stated that the presumption against extraterritoriality *does* apply to "[c]rimes against private individuals or their property, like assaults, murder, burglary, larceny, robbery, arson, embezzlement and frauds of all kinds." *Bowman*, 260 U.S. at 98, 43 S.Ct. 39; *see also Kollias v. D & G Marine Maintenance*, 29 F.3d 67, 71 (2d Cir. 1994) (holding that *"Bowman* should be read narrowly," such that "only criminal statutes, and perhaps only those relating to the government's power to prosecute wrongs committed against it, are exempt from the presumption [against extraterritoriality]").

1178; *see Aramco*, 499 U.S. at 248, 111 S.Ct. 1227 (stating that the presumption against extraterritoriality is not overcome unless there appears "the affirmative intention of the Congress clearly expressed" (internal quotation marks omitted)).[6] In searching for "clear evidence" of Congress's intent, we are not, however, limited to the text of the statute itself. To the contrary, we are permitted to consider "all available evidence" about the meaning of the statute, including its text, structure, and legislative history. *Sale*, 509 U.S. at 177, 113 S.Ct. 2549; *see Smith*, 507 U.S. at 201–03, 113 S.Ct. 1178 (examining text, structure, and legislative history); *see also Kollias v. D & G Marine Maintenance*, 29 F.3d 67, 73 (2d Cir.1994) ("[T]he Supreme Court has made clear … that reference to nontextual sources is permissible.").

### B.

By its terms, 18 U.S.C. § 2243(a) is limited in reach to the sexual abuse of a minor while "in the special maritime and territorial jurisdiction of the United States." The "special maritime and territorial jurisdiction of the United States" is, in turn, defined in 18 U.S.C. § 7 to include, among other places:

> [1] *Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof,* or [2] any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

*Id.* § 7(3) (emphasis added). The parties in the present case agree that jurisdiction, if it exists, is grounded in the first part of this subsection, which we underscore above. Thus, whether there is jurisdiction turns on two distinct questions: (1) whether Congress intended for § 7(3) to apply to lands outside the territorial boundaries of the United States, including, specifically, United States military installations; and (2) whether the United States exercises "exclusive or concurrent jurisdiction" over Lincoln Village.[7] We agree with Gatlin

---

**6.** In the present case, both parties appear to agree that the presumption against extraterritoriality applies. However, in a recent opinion involving the same jurisdictional provision at issue here, 18 U.S.C. § 7(3), Judge Sand declined to apply the presumption against extraterritoriality. *See United States v. Bin Laden*, 92 F.Supp.2d 189, 206 n. 32 (S.D.N.Y.2000). The presumption, Judge Sand reasoned, "was designed to apply to provisions that define offenses. When presented with the task of interpreting jurisdictional statutes such as Section 7(3), courts should simply employ the standard tools of statutory interpretation: analysis of text, structure and legislative history." *Id.*

We respectfully disagree with Judge Sand. Although § 7(3) is the immediate focus of our inquiry, the ultimate question here is whether a criminal statute—*i.e.*, 18 U.S.C. § 2243(a)—applies extraterritorially. The presumption against extraterritoriality plainly applies to criminal statutes (other than the *Bowman* variety, *see supra* note 5), so § 2243(a) applies extraterritorially only if there is a clear manifestation of Congress's affirmative intent. That this inquiry requires us to look to Congress's intent in enacting 18 U.S.C. § 7, which is incorporated by reference in § 2243(a), does not, in our view, alter the

applicable rule of statutory interpretation. Indeed, to accept Judge Sand's view would seriously undermine the presumption against extraterritoriality since Congress often enacts jurisdictional provisions that are then incorporated by reference elsewhere.

In any event, for reasons we discuss below, we would reach the same conclusion in this case even if the presumption against extraterritoriality did not apply. (In fact, notwithstanding his view that the presumption against extraterritoriality was inapplicable, Judge Sand himself concluded that § 7(3) applies only to lands within the United States—and dismissed several counts of the indictment at issue on that basis. *See* 92 F.Supp.2d at 204–16.)

**7.** Gatlin concedes that the United States exercises some jurisdiction over Lincoln Village by virtue of the SOFA. Nevertheless, he argues that the United States lacks jurisdiction *with respect to him* because the SOFA grants jurisdiction only to the United States "military authorities" and only over "persons subject to the military law of [the United States]." SOFA art. VII, § 1(a), 4 U.S.T. at 1798. As a civilian, under the circumstances presented, Gatlin is not subject to the military law of the United States.

that § 7(3) does not apply extraterritorially, and we therefore do not consider the second question.

### 1.

The leading case (and, surprisingly, the only appellate authority) on whether § 7(3) applies extraterritorially is the Fourth Circuit's decision in *United States v. Erdos,* 474 F.2d 157 (4th Cir.), *cert. denied,* 414 U.S. 876, 94 S.Ct. 42, 38 L.Ed.2d 122 (1973), on which, understandably, the District Court relied. *Erdos* involved a killing in the United States embassy in the Republic of Equatorial Guinea of an American citizen by another American citizen. *See id.* at 158. The defendant, Erdos, was tried and convicted in the United States District Court for the Eastern District of Virginia for violating 18 U.S.C. § 1112, which prohibits manslaughter in the "special maritime and territorial jurisdiction of the United States." *See* 474 F.2d at 158 & n. 1. On appeal, Erdos argued that the District Court lacked jurisdiction because § 7(3) (as here, the only possible basis for jurisdiction) did not apply to areas outside the United States, including the United States embassy in Equatorial Guinea.

The Fourth Circuit rejected Erdos's argument. The Court acknowledged that the third phrase of § 7(3) (concerning places " 'acquired by the United States by consent of the legislature of the *State* in which the same shall be' " and "thus presumably within the territorial boundaries of the United States," 474 F.2d at 159 (emphasis added)) could be read to modify and limit the more general coverage of the preceding two phrases. *See id.* at 159–60 ("The meaning is not perfectly clear. Nor is the legislative history. Such an interpretation is not implausible, and, indeed, it is possible that when the statute was enacted the attention of the Congress was not in the slightest focused on extraterritorial jurisdiction." (footnote omitted)). However, the Court rejected this reading. Instead, taking note of "the broad general language of phrases one and two—wholly

unnecessary to implement the establishment of forts, dockyards and other needful buildings within the states plainly accomplished by phrase three," and asserting that "[w]here the power of Congress is clear, and the language of exercise is broad, [there is] no duty to construe a statute narrowly," the Court reasoned:

> The first two phrases connected by the conjunctive "and" relate to and modify each other. The result is to create a jurisdictional category: lands reserved or acquired for the use of the United States and under its exclusive or concurrent jurisdiction. It is only the third phrase, separated from the first two by a comma and the disjunctive "or," that limits jurisdiction to places acquired (within the United States presumably) by the consent of state legislatures. We think the third phrase is independent of and does not modify the first two, and so read, the sentence describes two kinds of places or lands within the "special" jurisdiction of the United States.

*Id.* at 160. Based on this reasoning, the Court concluded that § 7(3) "is a proper grant of 'special' territorial jurisdiction embracing an embassy in a foreign country acquired for the use of the United States and under its concurrent jurisdiction." *Id.*

### 2.

The decision in *Erdos* has been followed by at least two district courts other than the District Court in the present case. *See United States v. Corey,* Cr. No. 96–01019DAE, slip op. at 3–13 (D.Haw. July 7, 1997) (order granting the government's motion in limine to prohibit objection to jurisdiction as a matter of law during trial) (holding that apartments leased by the United States Secretary of State to house American embassy employees in the Philippines are within the "special maritime and territorial jurisdiction of the United States"), *appeal pending,* No. 99–10232 (9th Cir.); *United States v. Corey,* Cr. No. 96–01019DAE, slip op. at 6–9 (D.Haw. Apr. 16, 1998) (order denying defendant's mo-

tion to dismiss indictment and granting the government's motion in limine to prohibit objection to jurisdiction) (holding that a United States Air Base in Yokota, Japan, is within the "special maritime and territorial jurisdiction of the United States"), *appeal pending*, No. 99–10232 (9th Cir.); *Witten v. Pitman*, 613 F.Supp. 63, 65–66 (S.D.Fla.1985) (holding that an area controlled by the United States Customs Service in the airport of Nassau, Bahamas, is within the "special maritime and territorial jurisdiction of the United States"). In addition, several courts, including this one, have repeated the *Erdos* holding in *dicta*. *See, e.g., Haitian Ctrs. Council, Inc. v. McNary*, 969 F.2d 1326, 1342 (2d Cir.1992) ("Interestingly, both United States citizens and aliens alike, charged with the commission of crimes on Guantanamo Bay [in Cuba], are prosecuted under United States laws." (citing, *inter alia*, 18 U.S.C. § 7)), *vacated on other grounds sub nom. Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 918, 113 S.Ct. 3028, 125 L.Ed.2d 716 (1993); *Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 841–42 & n. 11 (D.C.Cir.1984); *McKeel v. Islamic Republic of Iran*, 722 F.2d 582, 588–89 (9th Cir.

1983).[8] On the other hand, at least one court has rejected the *Erdos* decision, *see United States v. Bin Laden*, 92 F.Supp.2d 189, 206 (S.D.N.Y.2000) (stating that the *Erdos* Court's reasoning "is elliptical and disjointed"), and several commentators have criticized the decision severely, *see, e.g.,* Jordan J. Paust, *Non–Extraterritoriality of "Special Territorial Jurisdiction" of the United States: Forgotten History and the Errors of* Erdos, 24 YALE J. INT'L L. 305, *passim* (1999); Geoffrey R. Watson, *Offenders Abroad: The Case for Nationality–Based Criminal Jurisdiction*, 17 YALE J. INT'L L. 41, 52–53 & n. 84, 56–57 (1992); *see also, e.g.,* Susan S. Gibson, *Lack of Extraterritorial Jurisdiction over Civilians: A New Look at an Old Problem*, 148 MIL. L.REV. 114, 134 (1995).[9]

We reject the *Erdos* holding for several reasons. First and foremost, the *Erdos* Court failed to apply the proper canon of statutory construction. As noted, the Supreme Court has long held that courts should apply a presumption against extraterritoriality when interpreting statutes. Thus, absent "clear evidence of congressional intent" to apply a statute extraterri-

---

**8.** For present purposes, we need not, and do not, express a view on whether our *dictum* in *McNary* was correct. Although the United States base at Guantanamo Bay is technically outside the territorial boundaries of the United States, we stressed in *McNary* that the "status of the territory" is "unique." 969 F.2d at 1340; *see also* Agreement for the Lease to the United States of Lands in Cuba for Coaling and Naval Stations, Feb. 16 and 23, 1903, U.S.-Cuba, art. III, T.S. No. 418 ("[T]he Republic of Cuba consents that during the period of the occupation by the United States of [Guantanamo Bay] ... the United States shall exercise complete jurisdiction and control over and within said areas ...."), *quoted in McNary*, 969 F.2d at 1342. Accordingly, whether Guantanamo Bay is within the "special maritime and territorial jurisdiction of the United States" as defined in § 7(3) may involve separate considerations from those explored in this opinion.

**9.** Some criticism of *Erdos* is inapplicable to this case. For example, commentators have chided the *Erdos* Court for its statement that American embassies are " 'part of the territory of the United States.' " 474 F.2d at 159

(quoting *United States v. Archer*, 51 F.Supp. 708, 709 (S.D.Cal.1943)). *See, e.g., Bin Laden*, 92 F.Supp.2d at 212–13; Paust, *supra*, at 310–12. As a leading authority, co-edited by Sir Robert Jennings, the sometime Whewell Professor of International Law at the University of Cambridge and recent past President of the International Court of Justice, has explained, the extraterritoriality of embassy premises is an "inaccurate fiction" and the law of a receiving state "still appl[ies] to events taking place on a foreign embassy's premises." 1 OPPENHEIM'S INTERNATIONAL LAW § 494, at 1077 nn. 15–16 (Robert Jennings & Arthur Watts eds., 9th ed.1992); *see also* 1 RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 466 (1987) ("Acts committed on [diplomatic and consular] premises are within the territorial jurisdiction of the receiving state, and the mission is required to observe local law...."); *McKeel*, 722 F.2d at 588 ("A United States embassy ... remains the territory of the receiving state, and does not constitute territory of the United States.").

torially, a statute applies only within the territorial United States. *Smith,* 507 U.S. at 204, 113 S.Ct. 1178. In *Erdos,* however, the Court held that § 7(3) applies extraterritorially without demanding evidence, much less "clear evidence," that Congress intended such a result. Instead, the Court adopted a novel and insupportable canon of construction, holding that "[w]here the power of the Congress is clear, and the language of exercise is broad, we perceive no duty to construe a statute narrowly." 474 F.2d at 160. Remarkably, the Fourth Circuit itself also found that the meaning and legislative history of § 7(3) are "not perfectly clear" (more on that below) and that an alternative construction of the statute is "not implausible." 474 F.2d at 159. Thus, had the Court properly applied the presumption against extraterritoriality, there is little doubt it would have been compelled to reach a different conclusion.

Second, the *Erdos* Court's analysis of the statutory language was deeply flawed. The Court's reasoning took the following form: (1) because the first and second parts of § 7(3) ("[a]ny lands reserved or acquired ..." and "any place purchased or otherwise acquired ...") are independent and (2) because the second part applies, by its terms ("by consent of the legislature of the *State* in which the same shall be"), only to places within the United States, therefore (3) the first part ("[a]ny lands reserved or acquired ...") applies extraterritorially. *See* 474 F.2d at 160. However,

this conclusion is a *non sequitur.* It hardly follows logically from the Court's two unobjectionable premises—namely, that the two parts of § 7(3) are independent and that .the second part, by its terms, applies exclusively to lands within the United States—that the first part of § 7(3) must or should apply extraterritorially. In fact, from the face of the statute, it is equally possible that the first and second parts of § 7(3), though independent of each other, *both* were meant to apply exclusively to places within the United States. *See, e.g.,* Paust, *supra,* at 318 (stating that the first part of § 7(3) applies either to "lands" generally, as distinct from "places 'for the erection of ... building[s],' " or to lands "reserved or acquired" by the United States *without* the " 'consent of the legislature of the State in which the same shall be' ").[10] As the *Erdos* Court itself acknowledged, such an interpretation "is not implausible, and, indeed, it is possible that when the statute was enacted the attention of the Congress was not in the slightest focused on extraterritorial jurisdiction." 474 F.2d at 159–60.

### 3.

Were we limited to the face of § 7(3), we would be compelled to conclude that it does not apply outside the United States—based on the statute's ambiguity and the presumption against extraterritoriality. As it happens, however, other "available evidence," *Sale,* 509 U.S. at 177, 113 S.Ct.

10. As Professor Paust explains:
[U]nlike the first portion, the last portion of § 7(3) is limited by its terms to places purchased or otherwise acquired "by consent of the legislature of the State in which the same shall be." Some federal lands within what is now the United States were acquired directly by the United States without the "consent" of the legislature of a state within the United States (like Arlington Cemetery in Virginia—nearly within sight of Congress—and many places within the District of Columbia), and some were acquired in territorial form even before some states existed in such areas (especially in the West and Midwest). Indeed, in 1908 [when the immediate antecedent of § 7(3)

was first proposed] the Territory of Oklahoma had only become a state one year previous and New Mexico and Arizona were still not states, but rather were territories.... Certainly the existence of every national park, reserved land, wetlands, or military land area cannot rest on the "consent" of a state legislature. Thus, the first portion of § 7(3) can reach additional "lands" within the territorial boundaries of the United States that are subject to the exclusive or concurrent jurisdiction of the United States, but that are not reserved or acquired "by consent of the legislature" of any state....

Paust, *supra,* at 318–20 (footnotes omitted).

2549, about the meaning of § 7(3) reinforces this conclusion. That is, the historical development of § 7(3) indicates unequivocally that Congress, in fact, intended for the statute to apply only to lands within the territorial boundaries of the United States.[11]

#### a.

Although § 7(3) dates, in its present form, to 1940, the statute can be traced back to several provisions of an Act passed by the First Congress titled "An Act for the Punishment of certain Crimes against the United States." Act of April 30, 1790 ("1790 Act"), ch. 9, 1 Stat. 112. The 1790 Act did not establish a distinct jurisdictional provision (like 18 U.S.C. § 7); instead, the jurisdictional limits of the federal courts were incorporated separately into the substantive definition of each offense. Thus, for example, section 3 of the 1790 Act provided "[t]hat if any person ...

shall, *within any fort, arsenal, dock-yard, magazine, or in any other place or district of country, under the sole and exclusive jurisdiction of the United States,* commit the crime of wilful murder, such person ... shall suffer death." 1790 Act, ch. 9, § 3, 1 Stat. 113 (emphasis added); *see also, e.g., id.* § 7, 1 Stat. 113 (manslaughter); *id.* § 13, 1 Stat. 115 (maiming); *id.* § 16, 1 Stat. 116 (larceny).[12] By the terms of these provisions, therefore, the jurisdiction of the federal courts was limited to certain lands within the "sole and exclusive jurisdiction of the United States."

The fact that the 1790 Act delimited the jurisdiction of the federal courts to lands over which the United States exercised exclusive legislative jurisdiction "virtually guarantees" that the provision was not intended to apply to offenses committed in foreign territory. *Bin Laden,* 92 F.Supp.2d at 209. The notion that the United States could exercise *exclusive* leg-

11. The Government urges us to look at 18 U.S.C. § 7 as a whole in assessing whether there is "clear evidence" of congressional intent to apply 18 U.S.C. § 2243(a) extraterritorially. That is, the Government argues that because the "special maritime and territorial jurisdiction of the United States" plainly extends beyond the borders of the United States in some respects, *see, e.g., id.* § 7(7) ("Any place outside the jurisdiction of any nation with respect to an offense by or against a national of the United States"), the presumption against extraterritoriality is effectively overcome.

We reject this argument for two reasons. First, it makes little sense to inquire into congressional intent by looking at the statute as a whole since most subsections of § 7 were enacted separately by Congress and have their own legislative histories. Second, accepting the Government's argument would potentially frustrate one of the central purposes of the presumption against extraterritoriality—namely, the prevention of "unintended clashes between our laws and those of other nations which could result in international discord." *Aramco,* 499 U.S. at 248, 111 S.Ct. 1227. That Congress may have reconciled itself to the possibility of such clashes in some circumstances does not mean that it did so in all circumstances—let alone in the particular circumstances present in this case. If anything, the presumption against extraterritori-

ality, "far from being overcome here, is doubly fortified by the language of this statute," *Smith,* 507 U.S. at 204, 113 S.Ct. 1178 (internal quotation marks omitted), since subsections like § 7(7) confirm that Congress knows how to legislate extraterritorially when it so desires.

In any event, as we noted above, *see supra* note 6, we would reach the same conclusion in this case even if the presumption against extraterritoriality did not apply.

12. As discussed below, the jurisdictional language of the 1790 Act (which has been carried over in substantial part to § 7(3)) was based on Article I, § 8, Clause 17 of the United States Constitution, which provides in relevant part:

The Congress shall have Power ... To exercise exclusive Legislation in all Cases whatsoever ... over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings....

U.S. Const. art. I, § 8, cl. 17; *see also, e.g., United States v. Guiteau,* 12 D.C. (1 Mackey) 498, 528 (1882) ("[I]n designating the places in which the commission of murder should be deemed a crime against the United States, the legislature employed substantially, and to some extent, precisely the language found in [Article I, § 8, Clause 17]....").

islative jurisdiction over lands in a foreign nation—a notion that is difficult to sustain even today, *see, e.g.,* 1 RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES §§ 402–403 (1987)— would have been virtually inconceivable in 1790. Indeed, until at least the early part of the twentieth century, it was generally accepted that "every nation possesses exclusive sovereignty and jurisdiction within its own territory." JOSEPH STORY, COMMENTARIES ON THE CONFLICT OF LAWS § 18, at 21 (Boston, Little, Brown, and Co. 6th ed. 1865) (1834); *see The Schooner Exchange v. McFaddon,* 11 U.S. (7 Cranch) 116, 136, 3 L.Ed. 287 (1812) (Marshall, C.J.) ("The jurisdiction of the nation, within its own territory, is necessarily exclusive and absolute; it is susceptible of no limitation, not imposed by itself."); STORY, *supra,* § 20, at 22 ("[N]o state or nation can, by its laws, directly affect, ... or bind persons not resident therein, whether they are natural-born subjects or others.... [I]t would be wholly incompatible with the equality and exclusiveness of the sovereignty of all nations, that any one nation should be at liberty to regulate either persons or things not within its own territory."); Letter from Thomas Jefferson, Secretary of State, to Gouverneur Morris, United States Minister to France (Aug. 16, 1793), *reprinted in* 1 AMERICAN STATE PAPERS: FOREIGN RELATIONS 167, 169 (photo. reprint 1998) (1833) ("Every nation has, of natural right, entirely and exclusively, all the jurisdiction which may be rightfully exercised in the territory it occupies. If it cedes any portion of that jurisdiction to judges appointed by another nation, the limits of their power must depend on the instrument of cession."); *see also In re Ross,* 140 U.S. 453, 464, 11 S.Ct. 897, 35 L.Ed. 581 (1891) ("When ... the representatives or officers of our government are permitted to exercise authority of any kind in another country, it must be on such conditions as the two countries may agree, the laws of neither one being obligatory upon the other."); 26 Op. Att'y Gen. 12, 14 (1906) ("It can not be supposed that the makers of the Constitution would undertake, by their mere fiat, to confer upon Congress exclusive legislative power over a portion of a foreign country, nor is it probable that they were contemplating the erection of permanent forts and arsenals in foreign countries."). Accordingly, when the First Congress spoke of lands under the "sole and exclusive jurisdiction of the United States," it plainly was speaking of lands within the territorial boundaries of the United States.

**b.**

The 1790 antecedent of § 7(3) was codified and slightly amended in 1874, *see* 70 Rev. Stat., ch. 3, § 5339 (1874), but remained substantially in effect until 1909, when the 60th Congress passed "An Act To codify, revise, and amend the penal laws of the United States." Act of March 4, 1909 ("1909 Act"), ch. 321, 35 Stat. 1088. In the 1909 Act, which comprehensively codified all existing federal criminal law, Congress for the first time created a separate section devoted solely to defining jurisdiction. That section, which differed only slightly from the present § 7(3), provided that "the admiralty and maritime and the territorial jurisdiction of the United States" included

> any lands reserved or acquired for the exclusive use of the United States, and under the exclusive jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dock-yard, or other needful building.

1909 Act, ch. 321, § 272, 35 Stat. at 1143. (Specifically, the present § 7(3) differs from the 1909 Act in two ways: "exclusive use" is now simply "use" and "under the exclusive jurisdiction thereof" is now "under the exclusive or concurrent jurisdiction thereof." *See infra* Section II.B.3.c.)

From the statute's plain language, it is apparent that the 1909 Act, like its precur-

sor, applied only to lands within the United States. With respect to the first part of the 1909 Act—dealing with "any lands reserved or acquired for the *exclusive* use of the United States, and under the *exclusive* jurisdiction thereof"—the limitation of jurisdiction to lands over which the United States exercises "exclusive" jurisdiction again makes plain that Congress did not mean to refer to land in foreign territory. (Indeed, the 1909 Act went one step further even than the 1790 Act, *see supra* Section II.B.3.a, requiring also that the lands at issue have been reserved or acquired "for the exclusive use" of the United States.) The second part of the 1909 Act, on the other hand, was limited by its express terms ("by consent of the legislature of the *State* in which the same shall be") to lands within the United States.[13] Moreover, that part of the 1909 Act concerned lands acquired in accordance with Article I, § 8, Clause 17 of the United States Constitution, and, under the prevailing interpretation of that constitutional provision, such lands automatically were under the exclusive jurisdiction of the United States. *See Fort Leavenworth R.R. Co. v. Lowe,* 114 U.S. 525, 532–33, 5 S.Ct. 995, 29 L.Ed. 264 (1885). *See generally Bin Laden,* 92 F.Supp.2d at 208–09. Accordingly, the 1909 Act, like the 1790 Act, was limited to lands within the exclusive jurisdiction of the United States and, therefore, to lands within the territorial boundaries of the United States.

This understanding of the 1909 Act is confirmed by the available legislative history. Members of the special joint committee of Congress that recommended the Act stressed repeatedly that the new jurisdictional provision preserved the status quo. Senator Heyburn of Pennsylvania, the Senate manager of the bills that be-

came the 1909 Act, put the matter most bluntly, stating that the proposed legislation

> does not enlarge the jurisdiction of the United States courts by a hair's breadth.... Senators will find that *we have not attempted to enlarge the jurisdiction of the United States either technically or geographically.* We have simply gathered up a large number of existing provisions in the various statutes ... in order to avoid the repetition with each separate section of this geographical jurisdiction.... [*T*]*he committee* ... [*has*] *not enlarged the jurisdiction territorially or technically of the United States courts.*

42 Cong. Rec. 1186 (1908) (emphases added); *see also id.* at 589 (statement of Rep. Sherley) ("We have made no change in existing law in the way of new enactment that was not plainly in furtherance of the existing law. No question that involved a policy, no question about which there might be differences of opinion, politically or otherwise, has been embodied in this work."). Moreover, debates on the proposed legislation in the House and the Senate focused exclusively on the respective jurisdictional competencies of the federal and state governments. *See, e.g., id.* at 584–87 (statement of Rep. Moon, Chairman of the House Committee on the Revision of the Laws); *id.* at 589–90 (statement of Rep. Sherley); *id.* at 1185–86 (statement of Sen. Clay); *id.* at 1185–86 (statement of Sen. Heyburn). To the extent that legislators discussed any territory subject to the statute, they focused exclusively on lands purchased by the federal government from the states pursuant to Article I, § 8, Clause 17 of the Constitution or lands reserved by the federal government when a territory was admitted to

---

**13.** Although in the discourse of international relations the word "state" is sometimes used in reference to a foreign nation, it is apparent from the statute's text (*i.e.,* "by consent of the *legislature of the State*") as well as its history (*i.e.,* its derivation from Article I, § 8, Clause 17 of the Constitution, *see supra* note 12), that

Congress was referring in the second part of the 1909 Act to states *of the Union.* This conclusion is reinforced by the available legislative history. *See, e.g.,* 42 Cong. Rec. 586 (1908) (statement of Rep. Moon, Chairman of the House Committee on the Revision of the Laws).

the Union as a new state—both categories of lands that are, by definition, within the territorial United States. *See, e.g.,* 42 Cong. Rec. 584–87 (1908) (statement of Rep. Moon); *id.* at 1190 (statement of Sen. Heyburn); *id.* at 1193–94 (statement of Sen. Bacon). Nowhere in the legislative history of the 1909 Act—either in the floor debates or in the lengthy report of the Special Joint Committee on the Revision of the Laws, *see* S.Rep. No. 60–10, pt. 1, at 9–12 (1908)—is there any indication that the statute was meant to extend federal criminal jurisdiction to land in a foreign nation. *See also* 42 Cong. Rec. 586 (1908) (statement of Rep. Moon) (referring to "all territory ceded to [the federal government] by the States under the provisions of the Constitution," as well as "the high seas, ... American vessels, and ... all places outside of the jurisdiction of any particular State" as places over which the United States exercised "supreme and exclusive" jurisdiction).

**c.**

The 1909 Act was not altered by Congress until 1940, when, with virtually no debate, the 76th Congress amended the 1909 Act in two ways, thus enacting what is now § 7(3). *See* Act of June 11, 1940 ("1940 Act"), ch. 323, 54 Stat. 304. First, Congress deleted the word "exclusive" from the first phrase, so that jurisdiction no longer requires that lands be reserved or acquired "for the exclusive use" of the United States. *Id.* And second, Congress inserted the words "or concurrent" between "exclusive" and "jurisdiction" in the second phrase, so that jurisdiction now extends to "any lands reserved or acquired for the use of the United States, and under the exclusive *or concurrent* jurisdiction

thereof." *Id.* (emphasis added). Thus, for the first time, Congress granted the federal courts jurisdiction over crimes committed on lands that were not exclusively under the jurisdiction of the United States.

Notwithstanding this change, it is apparent from what little legislative history there is of the 1940 Act (a Senate Report and a House Report totaling three pages) that, in making this change, the 76th Congress did not intend to extend the reach of the statute to lands outside the United States. Rather, the purpose of the Act was to reach offenses committed on " 'Federal reservations, among them the George Washington Memorial Highway *in the State of Virginia,* in respect to which the jurisdiction of the United States is not exclusive but is concurrent *with that of the States.*'" H.R. Rep. No. 76–1623, at 2 (1940) (emphasis added) (quoting Letter from Frank Murphy, Attorney General, to William B. Bankhead, Speaker, House of Representatives (January 8, 1940)); *see also id.* (" '[The proposed legislation] would not deprive the States of any jurisdiction they now possess. It would merely give both the States and the Federal Government authority to deal with crimes committed in such areas ....'" (quoting Letter from Attorney General Frank Murphy)). As the one-page Senate Report on the Act put it: "The bill will have the effect of giving the United States concurrent jurisdiction *with the States* over criminal matters arising on such reservations where the United States does not have exclusive jurisdiction." S.Rep. No. 76–1708, at 1 (1940) (emphasis added).[14] Nothing in the sparse legislative history of the 1940 Act indicates that Congress envisaged application of the statute extraterri-

---

**14.** Both the House and Senate Reports indicate that the 1940 Act was enacted in response to *James v. Dravo Contracting Co.,* 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155 (1937). In *Dravo,* the Supreme Court had held for the first time that a state could retain concurrent jurisdiction over lands acquired by the United States with the consent of the state pursuant to Article I, § 8, Clause 17 of the Constitution.

Since the 1909 Act applied only to lands over which the United States had exclusive jurisdiction, the 1940 Act was needed "simply [to] restore[ ] to the Federal Government the jurisdiction it was recognized as having until the *Dravo* decision was handed down." H.R. Rep. No 76–1623, at 1; *accord* S. Rep. No. 76–1708, at 1.

torially—an application that would have been significant under both constitutional and international law.

In short, the legislative history of § 7(3) and its precursors demonstrates unequivocally that Congress, in fact, intended the statute to apply exclusively to the territorial United States. Accordingly, we conclude that Lincoln Village—where Gatlin's acts occurred—is not within the "special maritime and territorial jurisdiction of the United States"; that 18 U.S.C. § 2243(a) does not apply to Gatlin's acts; and that the District Court lacked jurisdiction to try him.

### C.

Our conclusion today—that Gatlin may not be prosecuted in a court of the United States for his conduct on a United States military installation in Germany—should come as little surprise to anyone familiar with the history of criminal prosecution of civilians accompanying the military overseas. Before the Supreme Court established in *Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), and its progeny, *see Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960); *Grisham v. Hagan*, 361 U.S. 278, 80 S.Ct. 310, 4 L.Ed.2d 279

(1960); *McElroy v. United States ex rel. Guagliardo*, 361 U.S. 281, 80 S.Ct. 305, 4 L.Ed.2d 282 (1960), that civilians may not be tried in courts martial during times of peace, courts uniformly had recognized that civilians accompanying the military overseas who committed crimes were prosecutable, if at all, *only* in courts martial.[15] Further, one can infer from their opinions that the Justices who decided *Reid v. Covert* and the later cases themselves understood that their decisions created a "jurisdictional gap" over crimes committed by civilians accompanying the military overseas. Thus, for example, Justice Clark, writing for the Court in *Singleton*, took special note of "the want of legislation providing for trials in capital cases in Article III courts sitting in the United States" and cited the Government's acknowledgment during oral argument "that there had been no effort in the Congress to make any provision for the prosecution of such cases either in continental United States or in foreign lands." 361 U.S. at 245, 80 S.Ct. 297. Dissenting in *Reid v. Covert* three years earlier, Justice Clark had been even more blunt: "All that remains is for the dependents of our soldiers to be prosecuted in foreign courts...." 354 U.S. at 90, 77 S.Ct. 1222 (Clark, J., dissenting).[16]

---

**15.** *See, e.g., Talbott v. United States ex rel. Toth*, 215 F.2d 22, 27–28 (D.C.Cir.1954), *rev'd on other grounds sub nom. United States ex rel. Toth v. Quarles*, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955); *In re Varney*, 141 F.Supp. 190, 200 (S.D.Cal.1956); *United States v. Kinsella*, 137 F.Supp. 806, 811 (S.D.W.Va.1956), *rev'd on other grounds sub nom. Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); *In re Di Bartolo*, 50 F.Supp. 929, 933 (S.D.N.Y.1943); *United States v. Burney*, 21 C.M.R. 98, 125 (C.M.A.1956); *United States v. Robertson*, 19 C.M.R. 102, 110–11 n. 2, 1955 WL 3407 (C.M.A.1955); *United States v. Rubenstein*, 19 C.M.R. 709, 785–88, 1955 WL 3505 (U.S.A.F. Bd. of Review 1955), *aff'd*, 22 C.M.R. 313, 1957 WL 4632 (C.M.A.1957); *see also* Note, *Criminal Jurisdiction over American Armed Forces Abroad*, 70 HARV. L.REV. 1043, 1057 (1957) (noting that if the Supreme Court were to rule that civilians accompanying the military overseas could not be tried in courts martial, host

countries would have exclusive jurisdiction over crimes committed by any such civilians).

**16.** *See also Singleton*, 361 U.S. at 246, 80 S.Ct. 297 ("[P]rosecution in the United States for the more serious offenses *when authorized* by the Congress, might well be the answer to the disciplinary problem." (emphasis added)); *id.* at 259, 80 S.Ct. 297 (Harlan, J., dissenting in *Singleton*) (opining that the Court's decisions in *Singleton* and companion cases "may result in our having to relinquish to other nations ... a substantial part of the jurisdiction now retained over American personnel under the Status of Forces Agreements"); *id.* at 276, 80 S.Ct. 297 (Whittaker, J., concurring in *Singleton*) (noting that "jurisdiction of our civil courts does not extend" to "bases in foreign lands"); *Reid*, 354 U.S. at 48, 77 S.Ct. 1222 (Frankfurter, J., concurring in the result) (acknowledging the Government's argument that "only a foreign trial could be had" if there were no courts martial jurisdiction);

Nor has this issue escaped notice since the Supreme Court's decisions in 1957 and 1960. To the contrary, during this period, commentators have observed with apparent unanimity that there exists a "jurisdictional gap" over crimes committed by civilians accompanying the military overseas. These commentators—including representatives of the armed forces,[17] other executive branch officials,[18] government commissions,[19] and independent scholars [20]—have

*id.* at 76 n. 12, 77 S.Ct. 1222 (Harlan, J., concurring in the result) (stating that trial of offenses by civilian dependents abroad in the United States is one of "the alternatives available to Congress," but noting that "the practical problems in the way of such a choice are obvious and overwhelming"); *id.* at 78, 77 S.Ct. 1222 (Clark, J., dissenting) ("The Court today releases two women from prosecution though the evidence shows that they brutally killed their husbands, both American soldiers, while stationed with them in quarters furnished by our armed forces on its military installations in foreign lands."); *id.* (arguing that the Court "gives no authoritative guidance as to what, if anything, the Executive or the Congress may do to remedy the distressing situation in which they now find themselves"); *id.* at 88, 77 S.Ct. 1222 (arguing that "trial of offenders by an Article III court in this country . . . even if the Congress and the foreign nation involved authorized such a procedure" would be "impracticable as a general solution to the problem" and, therefore, "[t]he only alternative remaining—probably the alternative that the Congress will now be forced to choose—is that Americans committing offenses on foreign soil be tried by the courts of the country in which the offense is committed").

**17.** *See, e.g., Extraterritorial Criminal Jurisdiction: Hearing on H.R. 763, H.R. 6148, and H.R. 7842 Before the Subcomm. on Immigration, Citizenship, and International Law of the House Comm. on the Judiciary*, 95th Cong. 42–62 (1977) (*"Extraterritorial Criminal Jurisdiction Hearing"*) (statement of Benjamin Forman, Assistant General Counsel, Department of Defense); Letter from L. Niederlehner, Acting General Counsel of the Department of Defense, to Sen. James O. Eastland, Chairman of the Senate Judiciary Committee (July 24, 1970), *reprinted in Operation of Article VII, NATO Status of Forces Treaty: Hearing Before a Subcomm. of the Senate Comm. on Armed Services*, 91st Cong. 4–10 (1970); *Operation of Article VII, NATO Status of Forces Treaty: Hearing Before a Subcomm. of the Senate Comm. on Armed Services*, 89th Cong. 2 (1966) (statement of Ray W. Bronez, Director, Foreign Military Rights Affairs, Department of Defense); DEPARTMENT OF ARMY, PAMPHLET 27–21, ADMINISTRATIVE & CIVIL LAW HANDBOOK para. 2–19c, at 59 (Mar. 15, 1992).

**18.** *See, e.g., Military Extraterritorial Jurisdiction Act of 1999: Hearings on H.R. 3380 Before the Subcomm. on Crime of the House Comm. on the Judiciary*, 106th Cong. (2000) (statement of Roger Pauley, Director of Policy and Legislation, Criminal Division, Department of Justice), *available* in 2000 WL 11070426 (CONGTMY Database, Mar. 30, 2000); *Extraterritorial Criminal Jurisdiction Hearing, supra*, at 30–33 (statement of Robert L. Keuch, Deputy Assistant Attorney General, Criminal Division, Department of Justice); *id.* at 62–65 (statement of James H. Michel, Assistant Legal Adviser, Department of State); *see also, e.g.*, Letter from David C. Gompert, Deputy Director, Politico–Military Affairs Bureau, Department of State, to J.K. Fasick, Director, International Division, General Accounting Office (June 8, 1979), *reprinted in* COMPTROLLER GENERAL OF THE UNITED STATES, REPORT TO CONGRESS: SOME CRIMINAL OFFENSES COMMITTED OVERSEAS BY DOD CIVILIANS ARE NOT BEING PROSECUTED: LEGISLATION IS NEEDED, 96th Cong. 43–47 (Sept. 11, 1979) ("GAO REPORT"); Letter from Kevin D. Rooney, Assistant Attorney General for Administration, Department of Justice, to Allen R. Voss, Director, General Government Division, General Accounting Office (July 5, 1979) ("DOJ Letter"), *reprinted in* GAO REPORT, *supra*, at 48–51.

**19.** *See, e.g.*, REPORT OF THE ADVISORY COMMITTEE ON CRIMINAL LAW JURISDICTION OVER CIVILIANS ACCOMPANYING THE ARMED FORCES IN TIME OF ARMED CONFLICT *passim* (1997 Report to the Secretary of Defense, the Attorney General and the Congress of the United States Pursuant to Pub.L. No. 104–106, § 1151) ("ADVISORY COMMITTEE REPORT"); GAO REPORT, *supra*, *passim*.

**20.** *See, e.g.*, Thomas G. Becker, *Justice on the Far Side of the World: The Continuing Problem of Misconduct by Civilians Accompanying the Armed Forces in Foreign Countries*, 18 HASTINGS INT'L & COMP. L.REV. 277, *passim* (1995); Peter D. Ehrenhaft, *Policing Civilians Accompanying the United States Armed Forces Overseas: Can United States Commissioners Fill the Jurisdictional Gap?*, 36 GEO. WASH. L.REV. 273, 276–80, 295–96 (1967); Robinson O. Everett & Laurent R. Hourcle, *Crime Without Punishment—Ex–Servicemen, Civilian Employees and Dependents*, 13 U.S.A.F. JAG L.REV. 184, *passim* (1971); Robert Girard, *The Constitution and Court–Martial of Civilians Accompanying the Armed Forces—A Pre-*

urged Congress for over four decades to close the jurisdictional gap by extending the jurisdiction of Article III courts to cover offenses committed on military installations abroad and elsewhere by civilians accompanying the armed forces.[21] Thus far, Congress has not responded to this call for legislation, though its inaction hardly can be blamed on a lack of awareness of the gap. Indeed, Congress has held several hearings on the matter,[22] and, over the last four decades, has entertained more than thirty bills aimed at closing the gap.[23] (Last year, the Senate passed a bill that would close the jurisdictional gap, see S. 768, 106th Cong. (1999); parallel legislation is pending before the House of Representatives, see H.R. 3380, 106th Cong. (1999).)

In short, for over fifty years, there has been a consensus—among all three branches of the federal government as well as academic commentators—that, notwithstanding the existence of § 7(3) and its

*liminary Analysis*, 13 STAN. L.REV 461, 507–08 & n. 217 (1961); Gregory A. McClelland, *The Problem of Jurisdiction over Civilians Accompanying the Forces Overseas—Still with Us*, 117 MIL. L.REV. 153, *passim* (1987); Jordan J. Paust, *Non–Extraterritoriality of "Special Territorial Jurisdiction" of the United States: Forgotten History and the Errors of* Erdos, 24 YALE J. INT'L L. 305, *passim* (1999); Lisa M. Schenck, *Child Neglect in the Military Community: Are We Neglecting the Child?*, 148 MIL. L.REV. 1, 22–23 (1995); Geoffrey R. Watson, *Offenders Abroad: The Case for Nationality–Based Criminal Jurisdiction*, 17 YALE J. INT'L L. 41, *passim* (1992); Stephen B. Swigert, Note, *Extraterritorial Jurisdiction—Criminal Law*, 13 HARV. INT'L L.J. 346, 353–55 (1972); Note, *Criminal Jurisdiction over Civilians Accompanying American Armed Forces Overseas*, 71 Harv. L.Rev. 712, 715–18 (1958); *see also, e.g.,* DONALD N. ZILLMAN ET AL., THE MILITARY IN AMERICAN SOCIETY 3–17 to –18 (1978) (discussing the "jurisdictional gap"); Robinson O. Everett, *Military Jurisdiction over Civilians*, 1960 DUKE L.J. 366, 392, 396–97 (same); Susan S. Gibson, *Lack of Extraterritorial Jurisdiction over Civilians: A New Look at an Old Problem*, 148 MIL. L.REV. 114, *passim* (1995) (same); Steven J. Lepper, *A Primer on Foreign Criminal Jurisdiction*, 37 A.F. L.REV. 169, 179–81 (1994) (same).

21. This consensus may help explain the dearth of cases on the issue presented here. At oral argument, the Government could cite only one other case in which a civilian was prosecuted for committing a crime within the "special maritime and territorial jurisdiction of the United States" based on conduct on a military installation overseas. *See* Tr. at 10–11 (discussing *United States v. Corey*, Cr. No. 96–01019DAE (D.Haw. Apr. 16, 1998) (order denying defendant's motion to dismiss indictment and granting the government's motion in limine), *appeal pending*, No. 99–10232 (9th Cir.)). As noted above, *Erdos* is the only appellate authority on the general question of whether § 7(3) applies extraterritorially.

22. *See, e.g., Extraterritorial Criminal Jurisdiction Hearing, supra*. For at least 18 years (if not longer), a Subcommittee of the Senate Armed Services Committee conducted annual hearings on the operation of Article VII of the NATO Status of Forces Treaty. *See, e.g., Operation of Article VII, NATO Status of Forces Treaty: Hearing Before a Subcomm. of the Senate Comm. on Armed Services*, 92d Cong. (1972). In almost every one of these hearings, the Subcommittee discussed the jurisdictional gap. *See, e.g., id.* at 2 (statement of Benjamin Forman, Assistant General Counsel, Directorate for Defense).

23. *See, e.g.,* S. 768 & S. 899, 106th Cong. (1999); H.R. 3380, 106th Cong. (1999); S. 2484, 105th Cong. (1998); H.R. 4651, 105th Cong. (1998); S. 3 & S. 172, 105th Cong. (1997); S.2083, 104th Cong. (1996); S. 3, S. 74 & S. 816, 104th Cong. (1995); H.R. 808, 104th Cong. (1995); H.R. 4531, 103d Cong. (1994); S. 129, 103d Cong. (1993); H.R. 5808, 102d Cong. (1992); S. 182, 102d Cong. (1991); S. 147, 101st Cong. (1989); H.R. 255, 99th Cong. (1985); S. 1437, 95th Cong. (1978); H.R. 763, 95th Cong. (1977); S. 1, 94th Cong. (1975); H.R. 3907, 94th Cong. (1975); S. 1745, 92nd Cong. (1971); H.R. 18548 & H.R. 18857, 91st Cong. (1970); S.2007, 90th Cong. (1967); H.R. 226, 90th Cong. (1967); S. 762, 89th Cong. (1965). *See generally* ADVISORY COMMITTEE REPORT, *supra*, at 9–11; GAO REPORT, *supra*, at 16–18.

The reasons for Congress's failure to act are not immediately apparent. However, nothing in the legislative record substantiates the conclusion of the United States District Court for the District of Hawaii that "Congress' failure to act, actually demonstrates the 'non-existence' of such a [jurisdictional] gap." *United States v. Corey*, Cr. No. 96–01019DAE, slip op. at 13 (D.Haw. Apr. 16, 1998) (order denying defendant's motion to dismiss indictment and granting the government's motion in limine), *appeal pending*, No. 99–10232 (9th Cir.).

precursors, United States courts lack jurisdiction over crimes committed by civilians accompanying the military overseas.[24] Moreover, this has been the official legislative position of the Department of Justice even as the U.S. Attorney's Office in Brooklyn, New York, pursued this prosecution and appeal. *See* sources cited *supra* note 18. Our decision today is only the latest consequence of Congress's failure to close this jurisdictional gap.

### III.

In closing, it is worth emphasizing several features of our holding today. First, our holding extends only to conduct outside the territorial boundaries of the United States for which 18 U.S.C. § 7(3) is the sole jurisdictional basis. Some federal criminal statutes are expressly extraterritorial, *see, e.g.,* 18 U.S.C. § 112(e) (protection of foreign officials, official guests, and internationally protected persons), and some criminal statutes—for example, offenses against the United States government—apply extraterritorially whether or not there is "clear evidence" of such intent by Congress due to the nature of the offenses involved, *see United States v. Bowman,* 260 U.S. 94, 98–99, 43 S.Ct. 39, 67 L.Ed. 149 (1922). *See generally Bin Laden,* 92 F.Supp.2d at 193–97. Our holding does not affect these categories of statutes.

Second, although Congress has not provided any jurisdiction to try civilians like Gatlin who commit crimes on military installations abroad, such individuals are usually subject to prosecution by the country in which such installations are based—in Gatlin's case, by Germany.

Finally, it clearly is within Congress's power to change the effect of this ruling by passing legislation to close the jurisdictional gap. It is for this reason that we have taken the unusual step of directing the Clerk of the Court to forward a copy of this opinion to the Chairmen of the Senate and House Armed Services and Judiciary Committees. In doing so, we should not be understood to express a view on the justice or wisdom of any potential legislation. In our system of government, "[t]he responsibility for the justice or wisdom of legislation rests with the Congress, and it is the province of the courts to enforce, not to make, the laws." *United States v. First Nat'l Bank of Detroit,* 234 U.S. 245, 260, 34 S.Ct. 846, 58 L.Ed. 1298 (1914). We merely note that this issue may warrant further congressional scrutiny.

In sum, we hold that 18 U.S.C. § 7(3) does not apply extraterritorially. Therefore, we conclude that Lincoln Village is not within the "special maritime and territorial jurisdiction of the United States," and that 18 U.S.C. § 2243(a) does not apply to Gatlin's acts. For these reasons, the judgment of conviction is reversed and the indictment is dismissed.

---

24. At oral argument, the Government argued that to the extent government officials have acknowledged the existence of a jurisdictional gap, that gap covers only offenses committed off military installations in foreign countries. *See* Tr. at 11–12. However, this is plainly inaccurate. *See, e.g.,* ADVISORY COMMITTEE REPORT, *supra,* at 41 ("[Military i]nstallations in foreign countries are not currently within the special maritime and territorial jurisdiction of the United States."); GAO REPORT, *supra,* at 5 ("The special territorial jurisdiction [established by § 7(3) ] does not apply ... to foreign military bases reserved or acquired for the use of the United States."); DOJ Letter, *supra,* at 2 ("DOJ is aware of no cases holding that foreign military bases are part of the special [maritime and] territorial jurisdiction of the United States.... [I]t has been held that an American Consulate is such an area [citing *Erdos* ], but consulates and embassies are very different from military bases, and the United States would likely incur serious international repercussions if it was argued that foreign bases are reserved or acquired for the use of the United States."); *see also, e.g.,* H.R. 763, 95th Cong. (1977) (extending jurisdiction to cover acts or omissions by civilians accompanying the military, among other places, "within Armed Forces installations or the area of operations of a unit in the field").